752 F.2d 817
 Robert DAVIDSON
v.
Edward O'LONE, Superintendent, Arthur Jones, Hearing
Officer, Joseph Cannon, Superintendent, and Robert
James, Internal Affairs.
Appeal of Joseph CANNON and Robert James.
 No. 82-5743.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 1, 1983.
Reargued In Banc May 7, 1984.
Decided Dec. 27, 1984.
 Originally Argued Dec. 1, 1983.
 
 Before GIBBONS and SLOVITER, Circuit Judges, and GREEN, District Judge*
 Reargued In Banc May 7, 1984.
 Before ALDISERT, Chief Judge**, SEITZ, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER and BECKER, Circuit Judges.
 Madeleine W. Mansier (argued), Deputy Atty. Gen., Irwin I. Kimmelman, Atty. Gen. of New Jersey, Trenton, N.J., for appellants Joseph Cannon and Robert James; James J. Ciancia, Asst. Atty. Gen., Trenton, N.J., of counsel.
 James D. Crawford (argued), Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellee.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 The principal issue presented by this appeal is whether 42 U.S.C. Sec. 1983 encompasses a claim for personal injury to a state prisoner based on the negligence of prison officials when New Jersey state law provides no remedy.[1]
 
 I.
 
 2
 Plaintiff Robert Davidson was an inmate at Leesburg State Prison when, on December 17, 1980, he intervened in a fight between two other inmates, Gibbs and McMillian. The three had disciplinary hearings on the morning of December 19, and immediately afterward McMillian threatened Davidson. Davidson returned to the hearing room to report the incident and, at the request of the guard on duty, wrote a note intended for Arthur Jones, the hearing officer. The note said:
 
 
 3
 When I went back to the unit after seeing you McMillian was on the steps outside the unit. When I was going past him he told me "I'll fuck you up you old mother-fucking fag." Go up to your cell, I be right there.
 
 
 4
 I ignored this and went to another person's cell and thought about it. Then I figured I should tell you so "if" anything develops you would be aware.
 
 
 5
 I'm quite content to let this matter drop but evidently McMillian isn't.
 
 
 6
 Thank you, R. Davidson.
 
 
 7
 Da14.
 
 
 8
 Jones, to whom the note was addressed, was a civilian and not part of the prison administration. He told the guard, Jose Garcia, to pass the note to the proper officials. At 11:40 a.m. Garcia delivered it to Joseph Cannon, assistant superintendent of the prison. Cannon read it and told Garcia to give it to Corrections Sergeant Robert James. Cannon testified later that he did not regard the situation as urgent because Davidson, whom he had known for years, did not contact him directly, as he had previously done in various situations.
 
 
 9
 Sergeant James was not in his office, and Garcia did not get the note to him until after 2:00 p.m. Garcia told him then that the note reported a threat by McMillian against Davidson. James attended to other matters, which he described as emergencies, leaving the note on his desk. At 4:00 he started a second shift, as Assistant Center Keeper, in another part of the prison. Between the time he received the note and the time he left the prison that night, James spent only about 10 minutes in his office. He forgot about the note, which he had not read. James acknowledged that in such a situation he would ordinarily interview the inmates. Though he was not able to attend to the matter that day, he testified that if he had remembered the note he would have posted it at the Center to alert officers on the morning shift.
 
 
 10
 Davidson, as the parties have stipulated, took no other steps to notify the authorities or request protective custody. He testified that he did not foresee the attack, but wrote the note to exonerate himself in the event that McMillian started another fight. Davidson also testified that he wanted officials to reprimand McMillian.
 
 
 11
 Neither Cannon nor James worked on December 20 or 21. On December 21, McMillian attacked Davidson with a fork, inflicting wounds to his face, neck, head and body, and breaking his nose. Though the stab wounds healed within several weeks, Davidson has undergone surgery to correct problems stemming from his broken nose, suffering continuing pain and residual effects.
 
 
 12
 Davidson was foreclosed from recovery from these defendants for his injuries under state law, for the New Jersey Tort Claims Act provides that "[n]either a public entity nor a public employee is liable for ... any injury caused by ... a prisoner to any other prisoner." N.J.Stat.Ann. Sec. 59:5-2(b)(4)(West 1982). The parties agree that as a result of this provision, Davidson has no state law claim for his injuries against the defendants or against the state.
 
 
 13
 Davidson brought suit in the United States District Court for the District of New Jersey under 42 U.S.C. Sec. 1983, naming as defendants Cannon, James, Jones, and Edward O'Lone, the prison superintendent. The court granted summary judgment in favor of O'Lone. The case against the other three was tried with Davidson appearing pro se. The court concluded that plaintiff did not establish an Eighth Amendment violation "because defendants did not act with deliberate or callous indifference to plaintiff's needs and because the incident complained of was a single attack." Da18. The court concluded, however, that Cannon and James, but not Jones, negligently failed to take reasonable steps to protect Davidson, that Davidson was injured as a result, and that their negligence deprived Davidson of a constitutionally protected liberty interest in freedom from assault while in prison. The court reasoned that because the New Jersey immunity provision denied Davidson a hearing, Davidson had been deprived of his liberty interest without due process. Davidson was awarded compensatory damages of $2,000.
 
 
 14
 Defendants appeal, contending that the district court erred in concluding that they were negligent, that the court erred in concluding that an inmate such as Davidson in a state prison has a liberty interest in being protected by prison officials from a single assault by another inmate, and that the court erred in concluding that 42 U.S.C. Sec. 1983 encompasses a claim arising out of a negligent failure by prison officials to protect an inmate against a single assault by another inmate. We will consider these contentions seriatim.
 
 II.
 
 15
 After hearing all of the relevant evidence, the district court concluded, with respect to Cannon and James:
 
 
 16
 We find that these two defendants negligently failed to take reasonable steps to protect plaintiff, and that he was injured as a result. Both of these officials had the responsibility to care for plaintiff's safety, actual notice of the threat by an inmate with a known history of violence, and an opportunity to prevent harm to plaintiff.
 
 
 17
 Da18.
 
 
 18
 Appellants concede that the applicable standard by which we must review the findings of the district court when sitting without a jury is the "clearly erroneous" standard contained in Rule 52(a) of the Federal Rules of Civil Procedure. See Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). Appellants thus bear the heavy burden of convincing us that the district court determination either "is completely devoid of minimum evidentiary support displaying some hue of credibility," or "bears no rational relationship to the supportive evidentiary data." Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir.1972).
 
 
 19
 The appropriate standard of care owed by prison custodians in New Jersey with respect to the risk of inmate injury was set forth in Harris v. State, 61 N.J. 585, 297 A.2d 561 (1972). As the court stated there, a prisoner is owed "a duty of due care while in custody" and further, "in appropriate circumstances [the prisoner] would be entitled to a recovery on a showing that a prison official negligently failed to discharge his responsibility for the [prisoner's] care with resulting injuries to him." Id. at 590, 297 A.2d at 563. The Harris court denied recovery because the defendants had received no warning of a danger to the plaintiff. In this case, the district court found that the defendants had "actual notice of the threat by an inmate with a known history of violence," Da18, which we find satisfies the Harris notice requirement. See also Restatement (Second) of Torts Sec. 320 (1965).
 
 
 20
 Appellants challenge the district court findings as clearly erroneous on several grounds. They contend that the district court erred in finding that they knew about McMillian's past, that they failed to exercise reasonable care to protect Davidson, and that their failure to follow the prison procedures proximately caused the injury. However, while we agree that on this record there would be room for the trier of fact to have reached a different conclusion as to negligence, we cannot hold that there was no negligence as a matter of law nor that we are "left with the definite and firm conviction that a mistake has been committed" by the district court in reaching its findings. United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Thus we accept the determination that defendants were negligent in failing to take steps to prevent McMillian's assault on Davidson.
 
 III.
 
 21
 Appellants argue that the district court erred as a matter of law when it identified a "liberty interest" protected by the Due Process Clause to be free from physical attack and injury. Since Sec. 1983, by its own terms, provides redress only when state employees infringe those rights "secured by the Constitution and laws" of the United States, see, e.g., Paul v. Davis, 424 U.S. 693, 700-01, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976); Smith v. Spina, 477 F.2d 1140, 1143 (3d Cir.1973), plaintiff must satisfy this threshold requirement before we need reach the question whether simple negligence can give rise to Sec. 1983 liability. See Baker v. McCollan, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). We must, therefore, decide whether plaintiff as a state prisoner had a constitutionally protected "liberty interest" in security from physical assault by fellow prisoners.
 
 
 22
 The constitutional right on which Davidson relies is that of his liberty interest in personal security protected by the Fourteenth Amendment. That the amendment covers such a basic personal right was affirmed by the Supreme Court in Ingraham v. Wright, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977), where it stated, "Among the historic liberties [protected by the due process clause] was a right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security."
 
 
 23
 Davidson's status as a prisoner does not deprive him of his right to rely on the Fourteenth Amendment. Because an inmate is not free to leave the confines which s/he is forced to share with other prisoners, the state bears the responsibility for the inmate's safety. Undoubtedly, a similar responsibility stemming from the state's control over the plaintiff underlay the Court's finding of a liberty interest in Ingraham, where the plaintiff was in a public school, in Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), where the plaintiff was an inmate of a state institution for the mentally retarded, and in City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983), where the plaintiff was injured while being apprehended by the police. The Supreme Court has "repeatedly held that prisons are not beyond the reach of the Constitution." Hudson v. Palmer, --- U.S. ----, ----, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984). As it recently stated, "[W]e have insisted that prisoners be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." Id.
 
 
 24
 This court held in Curtis v. Everette, 489 F.2d 516, 518 (3rd Cir.1973), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974), that the Due Process Clause is a valid basis for a prisoner's Sec. 1983 action seeking relief for injuries inflicted by another prisoner.[2] In Curtis, the allegations that defendant prison officials stopped the plaintiff prisoner from defending himself from an attack by another prisoner were held to implicate the plaintiff's constitutional "right to be secure in his person" under the Fourteenth Amendment. Id.
 
 
 25
 Appellants argue that the substantive due process right to personal security does not protect a state prisoner from an isolated attack by another prisoner. In so arguing, appellants have contracted into one issue what are in fact two separate issues, whether the liberty interest in bodily integrity protected by the Fourteenth Amendment covers the state's failure to prevent attacks by other prisoners and the circumstances under which Sec. 1983 provides a remedy for deprivation of that interest. Our focus in this section is directed only to the Fourteenth Amendment liberty interest.
 
 
 26
 As to that, we find no Supreme Court precedent that would limit the protected liberty interest in freedom from attack to those attacks inflicted by the state officials themselves. Certainly it would be absurd to argue that a state prisoner does not have a liberty interest that would be infringed were his or her state custodian deliberately to open the prison door knowing that a lynch mob converged outside. The state infringement would be as direct as if the prison guard had tied the rope around the prisoner's neck. The fact that there was only a single or isolated episode is irrelevant in determining whether a liberty interest was implicated.
 
 
 27
 That such a liberty interest covers attacks committed by persons other than state custodians has been recently affirmed in Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Romeo, an involuntarily committed resident of a state institution for the mentally retarded, claimed in his Sec. 1983 suit against administrators of the institution that his substantive right, inter alia, to safe conditions of confinement protected by the due process clause of the Fourteenth Amendment was violated because state officials were aware of and failed to take all reasonable steps to prevent his injury by other residents and by his own violence. The Court expressly recognized and reaffirmed the substantive liberty interest under the Fourteenth Amendment implicated by this claim. The Court stated:
 
 
 28
 In the past, this Court has noted that the right to personal security constitutes a "historic liberty interest" protected substantively by the Due Process Clause. Ingraham v. Wright, 430 U.S. 651, 673 [97 S.Ct. 1401, 1413, 51 L.Ed.2d 711] (1977). And that right is not extinguished by lawful confinement, even for penal purposes. See Hutto v. Finney, 437 U.S. 678 [98 S.Ct. 2565, 57 L.Ed.2d 522] (1978).
 
 
 29
 Id. at 315, 102 S.Ct. at 2458. Thus we reject appellants' contention that Davidson had no interest protected by the Constitution.
 
 IV.
 
 30
 The reasoning by which the district court concluded that Davidson was entitled to recover in this Sec. 1983 action against Cannon and James is as follows: Cannon and Jones were negligent; as a result of that negligence, Davidson was injured; freedom from bodily injury is a liberty interest which is protected by the Fourteenth Amendment of the Constitution; New Jersey does not provide prisoners, such as Davidson, with a remedy in state court because it immunizes its employees against claims for injuries to a prisoner caused by another prisoner; ergo Davidson can recover under Sec. 1983. We have noted our agreement with the district court's reasoning up to the step at which it concluded that Sec. 1983 liability extends to the negligent conduct of the prison officials in failing to investigate or take other action to protect Davidson.[3] We turn now to that question, denominated as "elusive" by the Supreme Court. Baker v. McCollan, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979).
 
 
 31
 There are literally hundreds of cases in the Courts of Appeals in which various aspects of this issue have arisen and no clearly discernible thread has evolved. As the Supreme Court has recognized, "The diversity in approaches [among the various federal courts] is legion." Parratt v. Taylor, 451 U.S. 527, 533, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981).[4] We begin, therefore, by examining the Supreme Court's own treatment of the issue.
 
 
 32
 Until the Court's decision in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), there was little case law dealing with violations of Sec. 1983 since most of the civil rights litigation against state officers before that time involved 18 U.S.C. Sec. 242, the criminal counterpart to Sec. 1983. In Monroe v. Pape, the Court held, inter alia, that because Sec. 1983, unlike Sec. 242, does not contain the word "willfully," proof of "willfullness" should not be required of a plaintiff seeking recovery under Sec. 1983. The Court defined "willfully" as the doing of an act with "a specific intent to deprive a person of a federal right." Id. at 187, 81 S.Ct. at 484. Justice Harlan, who concurred, addressed the relationship between the state action encompassed in Sec. 1983 and that covered under ordinary state tort law. He stated that one must attribute "to the enacting legislature the view that a deprivation of a constitutional right is significantly different from and more serious than a violation of a state right and therefore deserves a different remedy even though the same act may constitute both a state tort and the deprivation of a constitutional right." Id. at 196, 81 S.Ct. at 488 (emphasis added).
 
 
 33
 The language and some of the holdings of the subsequent Supreme Court cases considering this issue reflect the Court's rejection of the notion that every state tort committed by a state officer acting under color of state law is ipso facto converted into a violation of Sec. 1983. Thus, for example, in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Court held that a state prisoner subjected to medical malpractice does not automatically have a claim under Sec. 1983. The Court stated, "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106, 97 S.Ct. at 292.
 
 
 34
 In a case decided earlier that year, Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Court, speaking through Justice Rehnquist, held that a citizen defamed by police through circulation of a flyer of "active shoplifters" on which his name and photograph appeared did not state a claim for relief under Sec. 1983 and the Fourteenth Amendment. The Court expressly rejected the premise that "the Due Process Clause of the Fourteenth Amendment and Sec. 1983 make actionable many wrongs inflicted by government employees which had heretofore been thought to give rise only to state-law tort claims." Id. at 699, 96 S.Ct. at 1159. Justice Rehnquist stated that such a premise "would be contrary to pronouncements in our cases on more than one occasion with respect to the scope of Sec. 1983 and of the Fourteenth Amendment." Id.
 
 
 35
 The authority on which Justice Rehnquist relied was Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), where Justice Douglas had written for the plurality:
 
 
 36
 Violation of local law does not necessarily mean that federal rights have been invaded. The fact that a prisoner is assaulted, injured, or even murdered by state officials does not necessarily mean that he is deprived of any right protected or secured by the Constitution or laws of the United States.
 
 
 37
 Id. at 108-09, 65 S.Ct. at 1039, quoted in Paul v. Davis, 424 U.S. at 700, 96 S.Ct. at 1160. Justice Douglas' opinion in Screws continued with the caution that Congress should not be understood to have attempted
 
 
 38
 to make all torts of state officials federal crimes. It brought within [the criminal provision] only specified acts done 'under color' of law and then only those acts which deprived a person of some right secured by the Constitution or laws of the United States.
 
 
 39
 325 U.S. at 109, 65 S.Ct. at 1039, also quoted in Paul v. Davis, 424 U.S. at 700, 96 S.Ct. at 1160. Although Justice Douglas in Screws was construing the criminal analogue to Sec. 1983, these passages of the Screws opinion were used as applicable authority by the majority in Paul v. Davis in its interpretation of Sec. 1983. Indeed, Justice Rehnquist then proceeded to apply the analysis from Screws to reject the claim that defamation by the police fell within the scope of Sec. 1983 and of the Fourteenth Amendment. Justice Rehnquist wrote:
 
 
 40
 [Plaintiff] apparently believes that the Fourteenth Amendment's Due Process Clause should ex proprio vigore extend to him a right to be free of injury wherever the State may be characterized as the tortfeasor. But such a reading would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States. We have noted the "constitutional shoals" that confront any attempt to derive from congressional civil rights statutes a body of general federal tort law, Griffin v. Breckenridge, 403 U.S. 88, 101-102 [91 S.Ct. 1790, 1797-1798, 29 L.Ed.2d 338] (1971); a fortiori, the procedural guarantees of the Due Process Clause cannot be the source for such law.
 
 
 41
 Paul v. Davis, 424 U.S. at 701, 96 S.Ct. at 1160.
 
 
 42
 Shortly thereafter, in Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), the Supreme Court appeared ready to decide directly the issue before us since it granted certiorari to consider "[w]hether negligent failure to mail certain of a prisoner's outgoing letters states a cause of action under section 1983." Id. at 559 n. 6, 98 S.Ct. at 858 n. 6. Because the Court decided that the defendants were entitled to prevail on the defense of qualified immunity as a matter of law, it did not reach the question on which certiorari was granted.
 
 
 43
 Thereafter, in Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), the Court again confronted this question. Again, the Court disposed of the case on other grounds since it held that no constitutional right was implicated because the defendant police officer charged with false imprisonment under Sec. 1983 had acted on the basis of a valid arrest warrant. However, in his discussion concerning whether negligent conduct can form the basis of an award of damages under 42 U.S.C. Sec. 1983, Justice Rehnquist, once more writing for the Court, stated:
 
 
 44
 Having been around this track once before in Procunier, supra, we have come to the conclusion that the question whether an allegation of simple negligence is sufficient to state a cause of action under Sec. 1983 is more elusive than it appears at first blush. It may well not be susceptible of a uniform answer across the entire spectrum of conceivable constitutional violations which might be the subject of a Sec. 1983 action.
 
 
 45
 Id. at 139-40, 99 S.Ct. at 2692.
 
 
 46
 The duty upon which liability was sought to be predicated in Baker v. McCollan was closely akin to that Davidson relies on here. Plaintiff McCollan had been falsely imprisoned because his brother, the real culprit, had used plaintiff's driver's license as his identification. The Court of Appeals held that plaintiff's complaint stated a claim for relief under Sec. 1983 because under tort law "the sheriff or arresting officer has a duty to exercise due diligence in making sure that the person arrested and detained is actually the person sought under the warrant and not merely someone of the same or a similar name. See Restatement (2d) Torts Sec. 125, comment (d) (1965)." McCollan v. Tate, 575 F.2d 509, 513 (5th Cir.1978). Thus in McCollan, as in this case, plaintiff's claim was based on obligations under tort law of those state officials who have custody of prisoners.
 
 
 47
 The Supreme Court, in reversing the Court of Appeals decision, rejected the contention that the duty imposed by tort law would be automatically transmuted into a duty protected by the Constitution. Justice Rehnquist stated:
 
 
 48
 Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles. Just as "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," Estelle v. Gamble, 429 U.S. 97, 106 [97 S.Ct. 285, 292, 50 L.Ed.2d 251] (1976), false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official.
 
 
 49
 Id. 443 U.S. at 146, 99 S.Ct. at 2695-2696.
 
 
 50
 Thus, nothing in the Court's cases through 1979 provides any support for the principle that negligent conduct by a state official causing injury to the person constitutes a deprivation of a Fourteenth Amendment right which can be redressed in a Sec. 1983 suit. As authority for that position, the district court read the Supreme Court's opinion in Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), as holding "that a state official's negligence is sufficient to constitute a 'deprivation' for due process purposes." Da20. We turn to Parratt to determine if it supports the broad construction given it by the district court.
 
 
 51
 In Parratt the plaintiff prisoner brought an action claiming that his now famous hobby materials valued at $23.50 were negligently lost by prison officials in violation of his right under the Fourteenth Amendment not to have his property taken without due process of law. Plaintiff's claim was ultimately rejected by the Supreme Court, which held that because there were state remedies that could have fully compensated plaintiff for the property loss he suffered, the requirements of due process had been satisfied. 451 U.S. at 537-44, 101 S.Ct. at 1913-17. Recently, in Hudson v. Palmer, --- U.S. ----, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Court extended the Parratt holding to apply as well to certain intentional deprivations of a prisoner's property. It stated,
 
 
 52
 [W]e hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy is available. For intentional, as for negligent deprivations of property by state employees, the State's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.
 
 
 53
 Id. 104 S.Ct. at 3204. (emphasis added).
 
 
 54
 The holdings of Parratt and Hudson that the available state postdeprivation remedies provide adequate procedural due process do not meet the substantive due process issue presented in this case. However, in Parratt, before reaching the procedural due process issue Justice Rehnquist, writing for the Court, considered the scope of Sec. 1983, and wrote:
 
 
 55
 Nothing in the language of Sec. 1983 or its legislative history limits the statute solely to intentional deprivations of constitutional rights. In Baker v. McCollan [443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d (1979) ], we suggested that simply because a wrong was negligently as opposed to intentionally committed did not foreclose the possibility that such action could be brought under Sec. 1983 .... Section 1983, unlike its criminal counterpart, 18 U.S.C. Sec. 242, has never been found by this Court to contain a state-of-mind requirement. The Court recognized as much in Monroe v. Pape, 365 U.S. 167 [81 S.Ct. 473, 5 L.Ed.2d 492] (1961) ....
 
 
 56
 Both Baker v. McCollan and Monroe v. Pape suggest that Sec. 1983 affords a 'civil remedy' for deprivations of federally protected rights caused by persons acting under color of state law without any express requirement of a particular state of mind.
 
 
 57
 451 U.S. at 534-35, 101 S.Ct. at 1912-13 (footnote omitted).
 
 
 58
 Admittedly, this language standing alone is susceptible of the interpretation placed upon it by the district court that mere negligence can constitute a deprivation that can be redressed by a Sec. 1983 action. However, in the context of the development of the law set forth above, we conclude Parratt does not so hold.
 
 
 59
 Most significant is that in the two earlier cases also authored by Justice Rehnquist, Baker v. McCollan, decided only two years before Parratt, and Paul v. Davis, the Court vigorously rejected the suggestion that traditional torts became constitutional violations when committed by state officials. It is implausible that the Court would make a major pronouncement that constituted a 180 degree turnabout as to the scope of substantive due process or Sec. 1983 without discussion or analysis. This is particularly so because early in the Parratt opinion the Court specifically noted that it had "twice granted certiorari in cases to decide whether mere negligence will support a claim for relief under Sec. 1983," 451 U.S. at 532, 101 S.Ct. at 1911 (citing Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) and Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)) and stated that "in each of those [the Court] found it unnecessary to decide the issue." Id. Had the Court intended to finally decide the issue in Parratt that it had expressly left open previously, it is reasonable to expect that it would have done so affirmatively.
 
 
 60
 Instead, what the Court did was reiterate the statements in Monroe v. Pape and Baker v. McCollan that Sec. 1983 was not limited to intentional deprivation of constitutional rights. That proposition is not the obverse of one stating that Sec. 1983 encompasses suits for negligence by state officials, because there is a broad range of actions between the two poles. Indeed, Justice Powell, concurring in the result in Parratt, observed that the Court "passe[d] over the threshold question--whether a negligent act by a state official ... constitutes a deprivation of property for due process purposes." Id. 451 U.S. at 547, 101 S.Ct. at 1919. Thus, nothing in the Court's opinion in Parratt leads us to conclude that the Court held that merely negligent conduct by state officers constitutes a constitutional deprivation encompassed by Sec. 1983.
 
 
 61
 Of course, the absence of any conclusive Supreme Court holding that requires us to construe Sec. 1983 as encompassing all claims for negligence does not necessarily foreclose that interpretation. However, our own court's opinions, as well as precedent from other circuits that we find persuasive, have concluded that negligence claims are not encompassed within Sec. 1983. We reaffirm that conclusion, in large measure because of what we view as the purpose and essence of Sec. 1983.[5]
 
 
 62
 The essential element of a Sec. 1983 action is abuse by a state official of his or her official position. Monroe v. Pape, 365 U.S. at 172, 81 S.Ct. at 476. Justice Brennan has emphasized that "Section 1983 focuses on '[m]isuse' of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Paul v. Davis, 424 U.S. at 717, 96 S.Ct. at 1168 (dissenting opinion) (emphasis in original) (quoting United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)).
 
 
 63
 In Kent v. Prasse, 385 F.2d 406 (3d Cir.1967) (approvingly discussed by Justice Powell in his separate opinion in Parratt, 451 U.S. at 550-51, 101 S.Ct. at 1920-21), we held that a tort committed by a state official acting under color of state law is not, in and of itself, sufficient to show an invasion of a person's constitutional rights under Sec. 1983. That position was reiterated in a subsequent series of cases. See Black v. Stephens, 662 F.2d 181, 188 (3d Cir.1981), cert. denied, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982); Smith v. Spina, 477 F.2d 1140, 1143 (3d Cir.1973); Howell v. Cataldi, 464 F.2d 272, 277 (3d Cir.1972); Nettles v. Rundle, 453 F.2d 889 (3d Cir.1971). As we said in Rhodes v. Robinson, 612 F.2d 766, 772 (3d Cir.1979), "Where a person suffers injury as an incidental and unintended consequence of official actions, the abuse of power contemplated in the due process and [eighth] amendment cases does not arise."[6]
 
 
 64
 Various other courts since Parratt have also agreed that simple negligence does not suffice to state a claim under Sec. 1983. See Hull v. City of Duncanville, 678 F.2d 582, 584 & n. 2 (5th Cir.1982) (construing Parratt ); Mills v. Smith, 656 F.2d 337, 340 n. 2 (8th Cir.1981) (per curiam) (construing Parratt ). But see Howard v. Fortenberry, 723 F.2d 1206, 1209 n. 6 (5th Cir.1984); McKay v. Hammock, 730 F.2d 1367, 1373 (10th Cir.1984).
 
 
 65
 A construction that Sec. 1983 does not encompass negligence actions does not restrict its function as the primary vehicle to provide redress for unconstitutional action by state employees that violates the constitution.[7] We eschew prescribing a comprehensive litmus test to determine which actions are or are not within Sec. 1983, particularly since such a test has so far eluded the Supreme Court, but the pattern emerges from earlier cases.
 
 
 66
 Application of force by police officers or prison guards exceeding that which is reasonable and necessary under the circumstances states a claim under Sec. 1983. Black v. Stephens, 662 F.2d at 188; Howell v. Cataldi, 464 F.2d at 282; Martinez v. Rosado, 614 F.2d 829 (2d Cir.1980). Similarly, if the officials encouraged others to use excessive force, the officials would be liable. See Black v. Stephens, 662 F.2d at 189 (alternative basis for liability against police chief was policy of encouraging police officers to use excessive force).
 
 
 67
 Liability under Sec. 1983 may be imposed on prison officials even when the assault has been committed by another prisoner, if there was intentional conduct, deliberate or reckless indifference to the prisoner's safety, or callous disregard on the part of prison officials. See Wade v. Haynes, 663 F.2d 778, 780-81 (8th Cir.1981), aff'd on other grounds sub nom. Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (verdict sustained against correctional officers and the superintendent of the reformatory for placing the prisoner in a dangerous situation in which it was highly foreseeable that the assault would occur); Holmes v. Goldin, 615 F.2d 83, 85 (2d Cir.1980) (prisoner assaulted by another prisoner entitled to an opportunity "to show purposeful acts on the part of the correction officers or deliberate indifference to his safety amounting to a violation of due process.") This is consistent with our holding in Curtis v. Everette, 489 F.2d at 518, that allegations by a prisoner of "intentional conduct" by prison officials who stopped him from defending himself when assaulted by another prisoner stated a Sec. 1983 claim.
 
 
 68
 Other cases provide examples of conduct beyond mere negligence that fall within the scope of Sec. 1983. In Stokes v. Delcambre, 710 F.2d 1120, 1124 (5th Cir.1983), the court held that "the jury could have concluded that the jail was administered in a manner virtually indifferent to the safety of prisoners" and that under those facts, the defendants would be held to have violated the prisoners' constitutional rights, whether expressed in Fifth or Eighth Amendment terms. Moreover, when officials with a responsibility to prevent harm, such as prison officials, fail to establish or execute appropriate procedures for preventing serious malfunctions in the administration of justice, such failure would support a claim under Sec. 1983. See, e.g., Murray v. City of Chicago, 634 F.2d 365 (7th Cir.1980), cert. dismissed sub. nom. Finley v. Murray, 456 U.S. 604, 102 S.Ct. 2226, 72 L.Ed.2d 366 (1982). Similarly, a regulation issued by the Police Chief delaying disciplinary hearings against police officers until adjudication of the underlying arrest charges which caused officers to file unwarranted charges against plaintiff fell within Sec. 1983, Black v. Stephens, 662 F.2d at 189-90.
 
 
 69
 Another vital area in which Sec. 1983 plays an effective role is in providing a federal forum to challenge an established state procedure that infringes upon an individual's liberty or property interests, such as the Illinois procedure by which a claim could be terminated through no fault of the claimant declared invalid in Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), or the New Jersey statute prohibiting prisoners from bringing tort actions against public entities or employees while confined struck down in Holman v. Hilton, 712 F.2d 854 (3d Cir.1983).
 
 
 70
 We thus reaffirm that actions may be brought in federal court under Sec. 1983 when there has been infringement of a liberty interest by intentional conduct, gross negligence or reckless indifference, or an established state procedure.[8] The viability of such Sec. 1983 actions does not depend on whether or not a postdeprivation remedy is available in state court. We do not read anything to the contrary in the holdings in Parratt and Hudson, which concerned a prisoner's property right. It is untenable that the Court intended in those cases to subject all suits for unconstitutional acts under color of law, including those implicating a liberty or life interest, to a state remedy, if available. Such an interpretation would deprive Sec. 1983 of its original remedial purpose to "aid [in] the preservation of human liberty and human rights", see remarks of Representative Shellabarger during the Congressional debates surrounding the passage of the forerunner of Sec. 1983, quoted in Owen v. City of Independence, 445 U.S. 622, 636, 100 S.Ct. 1398, 1408, 63 L.Ed.2d 673 (1980), and would reduce its scope to the rare instances where the state has foreclosed a remedy, as here. The Court has repeatedly declined to require exhaustion of state remedies for Sec. 1983 actions. See Patsy v. Florida Board of Regents, 457 U.S. 496, 500, 102 S.Ct. 2557, 2559-60, 73 L.Ed.2d 172 (1982); Steffel v. Thompson, 415 U.S. 452, 472-73, 94 S.Ct. 1209, 1222, 39 L.Ed.2d 505 (1974) ("When federal claims are premised on [Sec. 1983] we have not required exhaustion of state judicial or administrative remedies)". We read Parratt and Hudson as decided in the context of prisoners' interests in their personal property which were fully redressable by the available state remedies.
 
 
 71
 In contrast, at issue here is a liberty interest. In determining whether behavior deprives the plaintiff of a substantive Fourteenth Amendment liberty interest, we must again focus on what constitutes due process. As the Supreme Court stated in Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), the Due Process Clause imposes requirements of decency and fairness because they are "implicit in the concept of ordered liberty". In Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the Court described a violation of substantive rights under the Due Process Clause as "conduct that shocks the conscience." Id. at 172, 72 S.Ct. at 209. The Court did not say whether anything less would suffice, and it declined to formulate a test: "Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.' " Id. at 173, 72 S.Ct. at 210.
 
 
 72
 The conduct of the two prison officials here fails to rise to that level. Cannon followed the established procedure in directing Davidson to the proper officer, but he simply failed to follow up. James, who was operating under a double shift burden, merely forgot to investigate a prisoner's note, which was ambiguous as to the nature of the threat, and conveyed no sense of urgency. When the only finding is that of mere negligence, as here, we cannot find the "outrageousness" or abuse of official power that warrants raising the tortious conduct of the prison official to the level of a deprivation of constitutional right within the scope of Sec. 1983. Accord Branchcomb v. Brewer, 669 F.2d 1297, 1298 (8th Cir.1982) (per curiam) (Eighth Amendment); Williams v. Kelley, 624 F.2d 695, 697-98 (5th Cir.1980) (Fourteenth Amendment), cert. denied, 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981).
 
 
 73
 In summary, we hold that Sec. 1983 retains its central role in affording remedies for victims of constitutional deprivation, but that such a role does not extend to providing a remedy for the type of negligence found in this case.[9]V.
 
 
 74
 Davidson has suggested that his claim should be viewed as one of deprivation of procedural due process. His contention appears to be that when New Jersey enacted the statute foreclosing suit by a prisoner against either the state or a prison employee for injuries suffered by another prisoner, N.J.Stat.Ann. 59:5-2(b)(4) (West 1982), it violated his right to procedural due process. For a number of reasons we reject this claim.
 
 
 75
 In the first place, plaintiff here, unlike the plaintiff in Holman v. Hilton, 712 F.2d 854 (3d Cir.1983), has not challenged the constitutionality of the statute. Plaintiff's claim, instead, is only for money damages from the defendants for the injuries inflicted by the assault.
 
 
 76
 In the second place, a claim for procedural due process must be predicated on deprivation of a substantive right or interest created by the Constitution, a statute or other entitlement. Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Since we have rejected Davidson's claim that his substantive right under the Fourteenth Amendment was deprived by defendants' negligence, and there has been no claim of a statutory or other entitlement, there is nothing to trigger an inquiry into what process is due.
 
 
 77
 In any event, nothing in the Constitution insures that a putative plaintiff may maintain a particular type of negligence claim in state court. The tradition of immunity was firmly rooted before the passage of Sec. 1983. See Owen v. City of Independence, 445 U.S. 622, 637-38, 100 S.Ct. 1398, 1408-09, 63 L.Ed.2d 673 (1980). In Martinez v. California, 444 U.S. 277, 281-83, 100 S.Ct. 553, 557-58, 62 L.Ed.2d 481 (1980), the Court rejected the claim that a state statute which foreclosed a tort suit established a federal constitutional violation. In sustaining the dismissal of a Sec. 1983 action brought for death caused by a released parolee, the Court held constitutional a state statute similar to that here providing all public entities and public employees with immunity from liability for their action in releasing a parolee.
 
 
 78
 Nor do we find any merit in plaintiff's argument which seeks to distinguish between previously existing immunities and those recently created. As the Court stated in Logan v. Zimmerman Brush Co., 455 U.S. 422, 432, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982):
 
 
 79
 the State remains free to create substantive defenses or immunities for use in adjudication--or to eliminate its statutorily created causes of action altogether--just as it can amend or terminate its welfare or employment programs.
 
 
 80
 (emphasis supplied). The Court explained in Ferri v. Ackerman, 444 U.S. 193, 198, 100 S.Ct. 402, 406, 62 L.Ed.2d 355 (1979), "For when a state law creates a cause of action, the State is free to define the defenses to that claim, including the defense of immunity, unless, of course, the state rule is in conflict with federal law." See Daniels v. Williams, 720 F.2d 792, 798 (4th Cir.1983).
 
 
 81
 The implication of Davidson's procedural due process claim is almost unlimited. It would subject to procedural due process scrutiny every state decision to immunize a public entity and employee from discrete claims, see, e.g., N.J.Stat.Ann. 59:4-6, (creating immunity from liability caused by the plan or design of public property). Davidson has provided no authority to support such a far reaching extension of procedural due process,[10] and the available authority, as stated above, is to the contrary.VI.
 
 
 82
 For the foregoing reasons we will reverse the judgment of the district court and direct entry of judgment for defendants.
 
 
 83
 GARTH, Circuit Judge, concurring, with whom WEIS, Circuit Judge, joins:[1]
 
 
 84
 Although I have joined Judge Sloviter's majority opinion, I write separately to express my view that even if mere negligence could constitute a deprivation of Davidson's liberty interest (a proposition with which I do not agree) there is no requirement or reason that a remedy must be provided by 1983 in federal court. Stated differently, just because no remedy is available to Davidson under state law, it does not follow that some remedy must be made available somewhere--and that therefore the remedy in this case must be a constitutionalized remedy under 1983. I suggest that only an incomplete analysis can reach such a result and that if an appropriate procedural due process analysis is employed,[2] the result in this case will be no different than the result at which the majority opinion has arrived by distinguishing between property and liberty interests. In both circumstances, Davidson still cannot prevail over the State and its officials.
 
 I.
 
 85
 If New Jersey, as it has here, provides immunity against Davidson's claim, then an appropriate due process analysis should be concerned with whether the state's interest in protecting its prison officials in such a situation outweighs Davidson's interest in having available a monetary cause of action against prison officials for merely negligent conduct. The particular balance to be struck must measure the state's interest in crafting its own tort laws and immunities against Davidson's interest in having more extensive remedies than those afforded by state law.[3]
 
 
 86
 In a similar context, the Supreme Court has written that "even if one characterizes the immunity defense as a statutory deprivation, it would remain true that the state's interest in fashioning its own rules of tort law is paramount to any discernible federal interest, except perhaps an interest in protecting the individual citizen from state action that is wholly arbitrary or irrational." Martinez v. California, 444 U.S. 277, 282, 100 S.Ct. 553, 557, 62 L.Ed.2d 481 (1980). In Martinez, the court held that a California statute, which granted absolute immunity to public employees responsible for parole-release decisions, was not an unconstitutional deprivation of due process when applied to defeat a tort claim arising under state law.
 
 
 87
 Nor should Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) be read to constrain a state's ability to establish its own substantive rules of law when such rules create no conflict with federal law. See Ferri v. Ackerman, 444 U.S. 193, 198, 100 S.Ct. 402, 406, 62 L.Ed.2d 355 (1979). In Logan v. Zimmerman Brush Co., 455 U.S. 422, 432, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982), the court reiterated that "the state remains free to create substantive defenses or immunities for use in adjudication--or to eliminate its statutorily created causes of action altogether--just as it can amend or terminate its welfare or employment programs."
 
 
 88
 No authority has been called to my attention that supports the conclusion that a state's immunity statute must ineluctably lead to a denial of due process such that section 1983 must be expanded to encompass negligence actions. The absence of a particular state remedy cannot, without more, require that a federal remedy be provided.[4] In terms of a procedural due process analysis, it then must be determined "what process is due" Davidson. The Fourth Circuit in Daniels v. Williams, 720 F.2d 792 (4th Cir.1983) held that a state may plead sovereign immunity as an affirmative defense. In that case the plaintiff would have received procedural due process when and even though the state's affirmative defense was sustained. Here, even if we were to assume that the negligence of the defendants, Cannon and James, amounted to a "deprivation of liberty," consideration must be given to the state's strong interest in protecting its prison officials from liability.
 
 
 89
 Such decisions require an inherently delicate determination, a determination which would balance prison order and safety against an individual's traditional desire to obtain a monetary response for injury suffered through a negligent act. Cf. Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (creating qualified immunity for public officials performing discretionary functions). Thus, in this instance, if the balance is struck in favor of the state as I suggest it must be, Davidson has had all the process which is his due. This being so, there is no requirement that Davidson be assured a cause of action against the state or the state's officers for arguably negligent conduct, let alone a 1983 action in federal court. This does not mean, of course, that Davidson may not pursue any claim that he may have against McMillan, the prisoner who actually attacked him.
 
 
 90
 Accordingly, I suggest that those who advocate a federal constitutional remedy by default (where no state remedy is available) have failed to consider and to balance the state's interest against the interest asserted by the claimant. In failing to do so, they have also failed to recognize that a state may afford appropriate due process without that process necessarily resulting in a recovery for the claimant.[5] See, e.g., Daniels v. Williams, 720 F.2d 792 (4th Cir.1983). In this case, therefore, it is evident to me that whether the majority's analysis is followed--an analysis and result which I believe to be wholly correct--or an appropriate due process analysis is developed--the conclusion we reach must necessarily be the same. Judgment must be entered for the defendants.
 
 
 91
 SEITZ, Circuit Judge, dissenting.
 
 
 92
 I part company with the majority because I read the Supreme Court's decision in Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), to dictate a different result. In Parratt, the Court considered whether "mere negligence will support a claim for relief under Sec. 1983 ...." Id. at 532, 101 S.Ct. at 1911. The polestar of its analysis was "the complex interplay of the Constitution, statutes and facts" of the particular case. The Court eschewed "a single, general principle, however just that principle may be in the abstract ...." Id. at 531-32, 101 S.Ct. at 1911. Thus, the question presented here is not the abstract one of whether, as a general principle, negligence may support a Sec. 1983 claim. Rather, the issue is whether plaintiff, under the facts of this case, has satisfied the specific requirements of Sec. 1983.
 
 
 93
 Looking to the language of the Fourteenth Amendment and Sec. 1983, the Parratt Court identified four elements which are necessary to any Sec. 1983 claim purporting to be founded on a violation of the Due Process Clause of the Fourteenth Amendment.[1] First, the conduct complained of must have been committed by a person acting under color of state law. Second, an interest in life, liberty, or property must be implicated. Third, the conduct complained of must amount to a deprivation. And fourth, the state must have failed to provide due process of law. Id. at 535-37, 101 S.Ct. at 1912-14. The Court then applied this legal standard to the facts in Parratt.
 
 
 94
 The case before us is determined by the application of this four-part analysis. First, the defendants' actions in this case were clearly under color of state law. See Monroe v. Pape, 365 U.S. 167, 172-85, 81 S.Ct. 473, 476-83, 5 L.Ed.2d 492 (1961). Defendants do not argue otherwise.
 
 
 95
 Second, as the majority holds, plaintiff's claim falls within the scope of his Fourteenth Amendment liberty interest in personal security. See Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). A prison inmate retains his liberty interest except to the extent that it is "fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." Hudson v. Palmer, --- U.S. ----, ----, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984). Plaintiff's interest in being free from assault was surely not inconsistent with his status as a prisoner or with any legitimate penological objective.
 
 
 96
 Third, the conduct complained of constitutes a deprivation. The Supreme Court held that the negligently caused loss of property in Parratt "[u]nquestionably ... amounted to a deprivation." 451 U.S. at 536-37, 101 S.Ct. at 1913 (footnote omitted); see Holman v. Hilton, 712 F.2d 854, 856 (3d Cir.1983) ("section 1983 affords a remedy for negligent deprivations"). I can think of no persuasive reason why a negligently caused loss of a liberty interest is any less of a deprivation.
 
 
 97
 Fourth, and finally, did the State of New Jersey provide due process of law? The state could not, of course, provide any predeprivation procedure. It has seen fit, however, to deny any postdeprivation remedy against defendants as well. Thus, we are not called upon to determine what would constitute adequate procedures in these circumstances. Furthermore, we need not consider the separate issue of what conduct might constitute a violation of substantive due process "even if undertaken with a full panoply of procedural protection" because it is "antithetical to fundamental notions of due process." Parratt v. Taylor, 451 U.S. at 545, 101 S.Ct. at 1918 (Blackmun, J., concurring). Since some procedural process is due when a person, acting under color of state law, deprives an individual of a liberty interest, the Due Process Clause of the Fourteenth Amendment has been violated in this case.[2] Therefore, plaintiff's claim is cognizable under Sec. 1983.
 
 
 98
 This conclusion does not implicate a significant increase in Sec. 1983 actions founded on alleged violations of the Due Process Clause because, as a general matter, states do not bar postdeprivation actions against their employees. States remain free, under Parratt, to provide an adequate postdeprivation remedy for their employees' negligent deprivations of property and negate the possibility of a Sec. 1983 claim based on the denial of procedural due process. The reasoning in Parratt suggests that the same is true in the liberty context. 451 U.S. at 537-44, 101 S.Ct. at 1913-17; see Thibodeaux v. Bordelon, 740 F.2d 329, 334-37 (5th Cir.1984) ("no reason to differentiate between liberty interests and property interests" in the context of procedural due process) (Wisdom, J.). And, of course, that plaintiff "might not be able to recover under these remedies the full amount which he might receive in a Sec. 1983 action is not ... determinative of the adequacy of the state remedies." Hudson v. Palmer, --- U.S. at ----, 104 S.Ct. at 3204; Parratt v. Taylor, 451 U.S. at 543-44, 101 S.Ct. at 1916-17.
 
 
 99
 My analysis implicitly rejects the contention that a prisoner cannot succeed under Sec. 1983 for a deprivation of his Due Process liberty interest in circumstances where the Eighth Amendment "deliberate indifference" standard would not be satisfied. Parratt mandates that this contention be rejected unless, under the Due Process Clause, prisoners' liberty interests are to be given less protection than their property interests. Furthermore, consistency does not require that the standards under the two provisions be the same. On the one hand, there is a constitutional violation whenever the Eighth Amendment "deliberate indifference" standard is satisfied, since the violation is the deliberate indifference itself. On the other hand, a negligent deprivation of a liberty interest amounts to a violation of procedural due process only where the state fails to provide adequate postdeprivation procedures, since for Due Process Clause purposes "the State's action is not complete until and unless it provides or refuses to provide a postdeprivation remedy." Hudson v. Palmer, --- U.S. at ----, 104 S.Ct. at 3204. In sum, the causes of action under the Eighth and Fourteenth Amendments are birds of entirely different feathers.
 
 
 100
 I disagree with the majority's holding essentially because it finds no deprivation in this case. It does so without quoting the essential language in Parratt, which holds that plaintiff's loss in that case "even though negligently caused, amounted to a deprivation." 451 U.S. at 536-37, 101 S.Ct. at 1913 (footnote omitted).
 
 
 101
 Justice Powell, concurring in the result in Parratt, "would not" have held, under the facts of that case, that "a negligent act ... works a deprivation in the constitutional sense." Id. at 548, 101 S.Ct. at 1919. That he refused to join the majority opinion supports my reading of Parratt. Although there is much to be said for Justice Powell's opinion, which "would avoid trivializing the right of action provided in Sec. 1983," we are not free to weigh the persuasiveness of his approach against that of the Court's and choose for ourselves which to apply.
 
 
 102
 Our court feels constrained to hold in this case that mere negligence does not constitute a deprivation, apparently because it equates two wholly different questions. The majority first notes that Parratt did not purport to announce a turn-around from the Supreme Court's prior position that traditional torts do not become constitutional violations simply because they are committed by state officials. On this basis it then concludes that the Parratt Court could not have held that mere negligence amounts to a deprivation. Although it is, of course, true that the Supreme Court did not hold that mere negligence by a state official amounts to a constitutional tort cognizable under Sec. 1983, it did hold that such negligence amounts to a deprivation. Therefore, if the other elements of a Sec. 1983 claim purporting to be founded on a violation of the Due Process Clause of the Fourteenth Amendment are made out; i.e., conduct under color of state law, a life, liberty or property interest, and a lack of adequate due process; then the Sec. 1983 claim is cognizable.
 
 
 103
 The majority focused on the abstract, general question, eschewed by the Supreme Court, of whether mere negligence amounts to a constitutional violation cognizable under Sec. 1983. Consequently, it failed to answer properly whether plaintiff has satisfied the specific requirements of the statute, particularly the "deprivation" requirement, as they were analyzed by the Supreme Court in Parratt. Plaintiff, in my view, has satisfied those requirements.
 
 
 104
 I would affirm.
 
 GIBBONS, Circuit Judge, dissenting:
 
 105
 The question presented in this appeal is a narrow one: may a state, when it involuntarily commits persons to the custody of state agents, thereby depriving those persons of the capacity for flight, self defense, or calls for assistance, consistent with the fourteenth amendment relieve those agents of the duty to take reasonable care to prevent third parties from injuring them. No broader issue is presented, for we are not here dealing with the duty of care owed to persons at liberty. No narrower question is presented either, for regardless of the reasons for commitment--civil or criminal, pre-trial or post-trial--every involuntarily committed person is identically deprived of the ability to resort to self help against the acts of third parties.
 
 
 106
 There was a time in our history when the government of the United States was so indifferent to the plight of persons involuntarily committed to custody by the states that it condoned hundreds of lynchings per year.[1] Among civilized persons in this twelfth decade of the fourteenth amendment, however, I would have hoped that a negative answer to the question presented would no longer be a matter of serious debate. Whatever a state may do in relieving its agents of the obligation to take reasonable care in performing other duties, no body politic calling itself humane should assert that the custodians of the involuntarily committed may be relieved of the duty to take reasonable care to prevent harm from befalling their charges.[2] Yet six judges of this court unfortunately are of the view that custodians may be relieved of that duty. Because I share a common humanity with the involuntarily committed, I dissent.
 
 I.
 The Injury
 
 107
 Robert Davidson, a former inmate of the New Jersey State Prison at Leesburg, suffered serious personal injuries when he was beaten and stabbed by another inmate. In a suit brought in the district court pursuant to 42 U.S.C. Sec. 1983 (1982) he contended that the beating and stabbing occurred because two state prison officers, Joseph Cannon and Robert James, failed to take reasonable care to prevent the incident. The trial court found that Cannon and James did fail to take reasonable care to prevent the incident, and awarded $2,000 in compensatory damages. This court holds unanimously that the district court's findings of fact are not clearly erroneous. Fed.R.Civ.P. 52(a). Therefore, for purposes of this appeal we agree that the state agents to whom the state entrusted custody of Davidson failed to take reasonable care to prevent a third party from inflicting harm on him.
 
 II.
 
 108
 The New Jersey Scheme for Relieving its Agents of Responsibility
 
 
 109
 An appreciation of the New Jersey scheme for relieving its agents of responsibility requires an examination of developments in another state. In Muskopf v. Corning Hospital District, 55 Cal.2d 211, 359 P.2d 457, 11 Cal.Rptr. 89 (1961) Justice Traynor, in a typically enlightened opinion, held that the doctrine of governmental immunity in tort had outlived its usefulness. While at that time governmental entities in California and elsewhere claimed sovereign immunity from respondeat superior liability for the acts of their agents and servants, those agents and servants were, like the rest of us, subject to common law remedies except to the extent that judicial, legislative or executive officer immunity doctrines held otherwise. In reaction to Justice Traynor's opinion the California legislature passed a two-year moratorium on the application of the Muskopf holding while the State Law Review Commission studied the matter further.[3]
 
 
 110
 Justice Traynor would simply have made governmental agencies liable on a traditional respondeat superior basis, leaving in place the centuries old common law individual liability in tort of state agents. The Commission proposed a radically different approach. Accepting the proposition that the state could be liable in tort on a respondeat superior basis, it proposed, for the first time, to enlarge the areas in which state agents would enjoy personal immunity, and to make the state's immunity coextensive.[4] The result of the Commission's efforts was the California Tort Claims Act of 1963.[5]
 
 
 111
 Several years later when the New Jersey legislature, observing the New Jersey Supreme Court's discomfort with sovereign immunity in cases such as B.W. King, Inc. v. West New York, 49 N.J. 318, 325, 230 A.2d 133, 137 (1967), considered the problem of governmental liability, it adopted the California approach, which recognized that governmental entities were subject to respondeat superior liability, but conferred on state agents in many instances an immunity from common law actions which they had never before in history enjoyed.[6] The purpose of the legislature to contract common law liability of state agents is clear, for it declared "that while a private entrepreneur may readily be held liable for negligence within the chosen ambit of his activity, the area within which government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done." N.J.Stat.Ann. Sec. 59:1-2 (West 1982). The declaration of purpose refers not to government liability as was the case under common law sovereign immunity, but rather to government duty. That change in focus from the absence of state liability to the absence of state duty is the central feature of the Act. It provides that "[a] public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable." Id. Sec. 59:2-2(b). Like its California counterpart, the New Jersey Act then provides a series of absolute statutory immunities which eliminate common law remedies historically available against such employees.[7]
 
 
 112
 The Tort Claims Act provides that the Attorney General must defend any action brought against a present or former state employee. Id. Sec. 59:10A-1. It provides, moreover, that the State shall provide indemnification to present and former employees except for punitive or exemplary damages. Id. Sec. 59:10-1. Thus under the Tort Claims Act the state's indemnification and defense undertaking, and the broad provisions for official immunity, are directly related. The state has undertaken to provide defense of claim and liability insurance for its employees, as a self-insurer, at public expense. Simultaneously, however, the state has attempted to protect its fisc, by conferring on its employees and retaining for itself absolute immunity from recovery for certain injuries. And, as is apparent from the Attorney General's appearance in this appeal, New Jersey construes its statutory defense and indemnification obligations as extending to the defense of actions brought pursuant to 42 U.S.C. Sec. 1983. The state is the real party in interest.
 
 
 113
 The atmosphere in which the New Jersey Tort Claims Act was considered by the legislature was hardly conducive to dispassionate reflection upon the appropriate balance between the needs of society and the accountability of state agents. At the time the Act was passed, lawsuits still were pending against New Jersey officials growing out of what the plaintiffs in those lawsuits contended were either excessive or inadequate reactions to the civil disturbances in 1967. In that atmosphere, perhaps not surprisingly, the legislature conferred several rather radical immunities on law enforcement officials and on custodians of involuntarily committed persons.
 
 
 114
 A number of New Jersey's immunity provisions bear upon the duty owed by custodians toward persons whom the state has placed in their charge. Perhaps the broadest is the provision that "[a] public entity is not liable for any injury caused ... by failing to enforce any law." N.J.Stat.Ann. Sec. 59:2-4 (West 1982). Moreover "[n]either a public entity nor a public employee is liable for failure to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service." Id. Sec. 59:5-4. Thus New Jersey public employees appear to be totally relieved of the duty to prevent even a lynching, for example. The Act also provides, that "[n]either a public entity nor a public employee is liable for failure to provide a medical facility or mental institution, or if such facility or institution is provided, for failure to provide sufficient equipment, personnel or facilities in a mental institution or medical facility."[8] Id. Sec. 59:6-2. When a person has been confined for mental illness (which by definition includes mental deficiency) "[n]either a public entity nor a public employee is liable for ... (b) an injury caused by any person who has been confined ... upon any other person so confined." Id. Sec. 59:6-7. Finally, "[n]either a public entity nor a public employee is liable for ... (b) any injury caused by: ... (4) a prisoner to any other prisoner." Id. Sec. 59:5-2b(4). Thus the New Jersey Act treats civilly committed mental patients, and both pretrial detainees and convicted prisoners, in the same manner. It has conferred on the custodians a total immunity from any claim that they failed to exercise any level of care to prevent harm from fellow inmates. Moreover by eliminating liability for failure to provide police protection, New Jersey has relieved non-custodians, as well, of any obligation to prevent such harm.[9]
 
 
 115
 Under the New Jersey immunity scheme the state agent's state of mind is irrelevant. Immunity attaches whether the immunized agent acted or failed to act intentionally, or in reckless disregard of the consequences, or without reasonable care. Thus, under New Jersey law, Davidson could not recover from Cannon or James, or from the state, for the injuries he received at the hands of his fellow inmate under any conceivable set of circumstances. And in this respect the outcome would be the same under New Jersey law had Davidson been a patient in a New Jersey mental institution.
 
 III.
 The Federal Liberty Interest
 
 116
 Recognizing that it is beyond the power of the legislature, in California or New Jersey, to relieve state agents acting under color of those states' laws, of duties imposed by the Constitution, the Attorney General of New Jersey urges that Davidson has no interest protected by the Constitution or laws of the United States. Any right that he had to personal security from harm by fellow prisoners ended, according to the state, when Davidson was involuntarily committed to the custody of those state agents upon whom New Jersey conferred immunity.
 
 
 117
 For a brief period in 1976 the Supreme Court appeared to be flirting with the dangerous notion that the liberty clause of the fourteenth amendment had no federal substantive content, except perhaps, such as was set forth explicitly in other provisions of the Constitution. One example of that dangerous flirtation is Paul v. Davis, 424 U.S. 693, 710, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976), effectively overruling the Court's holding in Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) that there is a federal substantive liberty interest in one's reputation. According to Paul v. Davis, the due process clause protects the personal liberty to maintain a good repute only if a state positive law creates such an interest in the first place. Other examples of the Court's tendency toward sapping the liberty clause of federal substantive content were Meachum v. Fano, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976) and Montanye v. Haymes, 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976), holding that a state prisoner had only such right to be free from transfer to more onerous conditions of confinement as could be found in state positive law. The tendency in those cases was to equate for purposes of analysis, the separate terms "life, liberty, or property" in the fourteenth amendment. Indeed the Court majority in those rather ominous opinions made essentially the same analyses with respect to due process protection of claimed personal liberty interests as in modern times it customarily makes with respect to due process protections of property. See, e.g., Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (state law contract right required before employment is protected by due process clause); Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (state statutory right to attend school cannot be terminated without due process); Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (state law contract right required before employment is protected by due process clause); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (federal statutory entitlement cannot be terminated without due process). Cf., e.g., Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (state law cannot intrude upon federally protected right to contract). The Court's recognition that property rights are always creatures of some sovereign's positive law, and thus that the term "property" in the fourteenth amendment must always have some positive law content--usually state law--was entirely sound. But it was one thing to hold that a property interest did not exist aside from some state positive law which created it, and quite another to hold that the right to life or to liberty was equally dependent on state positive law. That mode of analysis would enable the state legislatures to deprive the life and liberty clauses of the fourteenth amendment of any real meaning. Justice Stevens saw in the Court's mode of analysis the danger that positivism would degenerate into totalitarianism, and sounded the alarm in his dissent in Meachum v. Fano:
 
 
 118
 If man were a creature of the State, the analysis would be correct. But neither the Bill of Rights nor the laws of sovereign States create the liberty which the Due Process Clause protects. The relevant constitutional provisions are limitations on the power of the sovereign to infringe on the liberty of the citizen. The relevant state laws either create property rights, or they curtail the freedom of the citizen who must live in an ordered society. Of course, law is essential to the exercise and enjoyment of individual liberty in a complex society. But it is not the source of liberty, and surely not the exclusive source.
 
 
 119
 I had thought it self-evident that all men were endowed by their Creator with liberty as one of the cardinal unalienable rights. It is that basic freedom which the Due Process Clause protects, rather than the particular rights or privileges conferred by specific laws or regulations.
 
 
 120
 427 U.S. at 230, 96 S.Ct. at 2541 (Stevens, J., dissenting).
 
 
 121
 Whether because of Justice Stevens' warning against statism or for other reasons, the Court in 1977 reconsidered its drift in that direction. In Ingraham v. Wright, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977) it held that "[a]mong the historic liberties ... protected [by the due process clause] was a right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security." The holding in Ingraham v. Wright was a reiteration of the position taken by the Court prior to its 1976 flirtation with statism in matters of personal liberty. Indeed the court in Ingraham v. Wright relied on its holding in Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) that the state violated a defendant's right to personal security by subjecting him, involuntarily, to a stomach pump. 430 U.S. at 673-74, 97 S.Ct. at 1413-14. The holding in Ingraham v. Wright confirmed the soundness of this court's opinion in Curtis v. Everette, 489 F.2d 516, 518 (3d Cir.1973), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974) that the fourteenth amendment was violated when prison guards permitted an assault on the plaintiff by a fellow prisoner, for our opinion also relied on Rochin v. California.
 
 
 122
 A year after Ingraham v. Wright, the Court in Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) reconfirmed that the fourteenth amendment, entirely aside from state positive law, recognized the personal liberty to be free from constraint, holding that despite the state's parens patriae powers in providing care for persons unable to care for themselves, the state could not involuntarily commit those persons on proof of their condition no more substantial than a preponderance of the evidence.[10]
 
 
 123
 The right of personal security at issue in Ingraham v. Wright was that of a student who was at liberty except for the mild coercion of the state's school attendance law. In Addington v. Texas the person alleged to be mentally ill was at liberty until the state attempted his involuntary confinement. Nevertheless the Court's reliance in Ingraham v. Wright on Rochin v. California, which involved a pretrial detainee, suggested that it would not distinguish, for purposes of the existence of the right to personal security, between persons at liberty and persons confined. This was confirmed a year after Addington v. Texas when in Vitek v. Jones, 445 U.S. 480, 490-91, 100 S.Ct. 1254, 1262-63, 63 L.Ed.2d 552 (1980) the Court held that even a convicted prisoner had a federally protected liberty interest, entirely apart from state positive law, in freedom from confinement in a mental institution.
 
 
 124
 Still more recently in Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) the Court strongly reiterated that all involuntarily committed persons, entirely aside from state positive law, retained a federally protected interest in personal safety. Id. at 315-16, 102 S.Ct. at 2458. The quotation in Judge Sloviter's opinion from Justice Powell's opinion of the Court in Youngberg v. Romeo establishes unequivocally that the right to be confined only in safe conditions applies equally to all persons whom the state commits involuntarily, regardless of the purpose of the confinement.
 
 
 125
 All the judges participating in this appeal, albeit with varying degrees of enthusiasm, join in rejecting New Jersey's contention that Davidson had no constitutionally protected right to personal safety while he was confined.[11] Convicted prisoners, pretrial detainees, and the civilly committed all have that same right.[12]
 
 IV.
 
 126
 The Absence of a State of Mind Requirement in Section 1983
 
 
 127
 Section 5 of the fourteenth amendment authorizes Congress to enforce its provisions by appropriate legislation. Congress might have left the enforcement of the amendment primarily to the Supreme Court exercising supervision over the courts of the states. Instead, even before its effective date, Congress passed for the first time a statute of general application implementing the first clause in article III section 2 of the Constitution, authorizing the lower federal courts to exercise jurisdiction in cases arising under the Constitution and laws of the United States.[13] When, following ratification of the amendment, Congress reenacted parts of the earlier statute, it used the broadest conceivable language, providing that "any person who ... shall subject, or cause to be subjected, any person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress...."[14] This statute, codified at 42 U.S.C. Sec. 1983, still contains the sweeping language of the 1871 Congress.
 
 
 128
 When the 1871 Congress acted, the federal courts had little prior experience with federal question jurisdiction. The only previous jurisdictional statute of any moment in that respect was that chartering the Second Bank of the United States, which had afforded the Marshall Court its sole opportunity to construe the first clause in article III section 2. In Osborn v. United States Bank, 22 U.S. (9 Wheat.) 326, 6 L.Ed. 204 (1824) the Court held that Congress could confer on the lower federal courts federal question subject matter jurisdiction over any case in which was presented a question over which, had the case arisen in a state court, the Supreme Court would have potential appellate jurisdiction. It is reasonable to conclude that the sweeping language of the 1871 Civil Rights Act was intended to implement article III section 2, with respect to matters covered by the fourteenth amendment, to the full extent permitted under Osborn. Moreover, at the time of its enactment, federal equity practice was nationally uniform. On the law side, however, the federal courts under the Process Act[15] borrowed the practice, as of the date of each state's admission to the Union, of the states in which they sat. Thus one may be reasonably certain that in 1871 when Congress used the language "any action at law" it was fully cognizant of the fact that government agents had always been subject to the full range of common law remedies, many of which had no state of mind requirement, and that in the future, persons acting under color of state law would be subject to that same full range of common law remedies in the federal courts.
 
 
 129
 The Civil Rights Act of 1871 was, of course, anesthetized by the Court following the constitutional settlement of 1877.[16] So deep was the sleep that a leading expert on practice in the federal courts writing in 1925 did not even include that Act in a listing of statutes providing exceptions to the jurisdictional amount requirement. See, Dobie, Jurisdictional Amount in the United States District Court, 38 Harv.L.Rev. 733, 738 (1925). The Act remained dormant until the late 1930's. When it reemerged, the initial cases which placed any significance on the Act involved intentional action of a rather extreme sort.[17] Because the early cases after the statute was rediscovered involved conduct that was not only intentional, but also specifically endorsed by state law, it was not until some years after the Federal Rules of Civil Procedure had supplanted common law remedies in the federal courts that the Supreme Court addressed the question whether, for the first time, a state of mind requirement should be read into the sweeping language of section 1983. In Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) the Court, for the first time after the post-reconstruction era, examined with any degree of consciousness the congressional intention reflected in the 1871 Act.[18] Even Justice Frankfurter, who never fully reconciled himself to the Warren Court's disassociation from the constitutional settlement of 1877, acknowledged that a specific intent requirement could not be read into section 1 of the Act, although the criminal counterpart originating in the same statute had been so construed. In Monroe, he wrote:
 
 
 130
 If the courts are to enforce Sec. [1983], it is an unhappy form of judicial disapproval to surround it with doctrines which partially and unequally obstruct its operation. Specific intent in the context of the section would cause such embarrassment without countervailing justification. Petitioners' allegations that respondents in fact did the acts which constituted violations of constitutional rights are sufficient.
 
 
 131
 365 U.S. at 207-08, 81 S.Ct. at 495 (Frankfurter, J., dissenting in part). Justice Frankfurter's dissent focused, instead, on the absence of a constitutional violation because the actions of the defendants were illegal under state law.[19] On that issue Justice Frankfurter stood alone. The Court was unanimously of the view, however, that no specific intent requirement could legitimately be written into section 1983 by judicial usurpation of the legislative function. If section 1983 was to reemerge from the closet in which it had been hidden by the post-reconstruction Court, it would reemerge as written. In the words of Justice Douglas, section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." 365 U.S. at 187, 81 S.Ct. at 484.
 
 
 132
 The decision in Monroe v. Pape was not greeted with universal enthusiasm, even among article III judges.[20] Despite Monroe v. Pape's clarity on the state of mind issue, litigants frequently attempted to convince lower federal courts to judicially write a state of mind requirement into section 1983. One such attempt was made in this court when the defendants urged that the fact that a policeman defendant was motivated by personal animosity against the plaintiff sufficed to place his acts outside the scope of section 1983. That contention was rejected in Basista v. Weir, 340 F.2d 74 (3d Cir.1965) by Judge Biggs, who unlike many of his contemporaries and successors, was an enthusiastic protector of civil rights.[21] His opinion stated:
 
 
 133
 While a specific intent to deprive a person of his constitutional rights is required under criminal sections of the Civil Rights Acts, 18 U.S.C. Secs. 241, 242, neither specific intent nor purpose to deprive an individual of his civil rights is a prerequisite to civil liability under the civil provisions of the Civil Rights Act.
 
 
 134
 Id. at 81. That, of course, was precisely what the Supreme Court had held unanimously in Monroe v. Pape, a case on which Judge Biggs expressly relied. Id. Monroe v. Pape and Basista v. Weir required no more than proof of action under color of state authority, which is in this case conceded. Unlike Judge Sloviter's sophistical effort to find, in the several opinions written in Monroe v. Pape, something which is not there, Judge Biggs' treatment of that case is consistent with the position taken by all the Justices on the critical issue in that case--namely that only the state could violate the Constitution. The language of Justice Harlan quoted by Judge Sloviter, p. 823, refers to that issue--the identity of the actor--not to any state of mind requirement.
 
 
 135
 Because not all lower court federal judges shared Judge Biggs' admirable enthusiasm for holding accountable all persons acting under color of state authority, it was not surprising that efforts to have the Court read a state of mind requirement into section 1983 would persist. Those efforts, as Judge Sloviter acknowledges, produced "no discernable thread." P. 823. Resistance to accountability by state officials in federal courts for their actions taken under color of state law did not slacken as the personnel of the Supreme Court changed during the 1970's, and several times it appeared that the Monroe v. Pape interpretation of section 1983 might be reconsidered. As Judge Sloviter acknowledges, the Court in Procunier v. Navarette, 434 U.S. 555, 559 n. 6, 98 S.Ct. 855, 858 n. 6, 55 L.Ed.2d 24 (1978) granted certiorari to consider whether a state of mind requirement should be read into that section, but the case was decided on an unrelated ground.
 
 
 136
 When the Fifth Circuit Court of Appeals held in McCollan v. Tate, 575 F.2d 509 (5th Cir.1978) that a plaintiff should have a claim presented to the jury that the defendant sheriff had failed to take reasonable care to prevent his deputies from violating plaintiff's constitutional rights, the Court once again considered the section 1983 state of mind question. Justice Rehnquist wrote for the Court:
 
 
 137
 Having been around this track once before in Procunier, supra, we have come to the conclusion that the question whether an allegation of simple negligence is sufficient to state a cause of action under Sec. 1983 is more elusive than it appears at first blush. It may well not be susceptible of a uniform answer across the entire spectrum of conceivable constitutional violations which might be the subject of a Sec. 1983 action. In any event, before the relationship between the defendant's state of mind and his liability under Sec. 1983 can be meaningfully explored, it is necessary to isolate the precise constitutional violation with which he is charged.
 
 
 138
 Baker v. McCollan, 443 U.S. 137, 139-40, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). The deprivation alleged in Baker v. McCollan was the detention, pursuant to a valid arrest warrant, of the wrong party. The Court held that the plaintiff had shown no invasion of any federally protected right, and thus once again declined to overrule the unanimous holding in Monroe v. Pape that section 1983 includes no state of mind requirement. Justice Rehnquist's admonition, however, that the answer to the question whether failure to exercise reasonable care to avoid or prevent constitutional violations "may not be susceptible of a uniform answer across the entire spectrum of constitutional violations" shows his awareness of the need to focus upon the nature of the interest being invaded--either liberty or property--and upon the extent to which actions by the state may have made it impossible for the victim to have avoided the invasion by action of his own.
 
 
 139
 It should be noted that in Baker v. McCollan the Court decided a constitutional law issue, holding that the fourth amendment was not violated by an inadvertent arrest and detention of the wrong defendant pursuant to a valid warrant. A construction of section 1983 which would have read into it a state of mind requirement higher than the departure from reasonable care would have permitted the Court to avoid the decisions of that constitutional law question. See Hagans v. Lavine, 415 U.S. 528, 537-43, 94 S.Ct. 1372, 1379-82, 39 L.Ed.2d 577 (1974). The Court could have held that assuming, arguendo, a fourth amendment violation had occurred as a result of the failure to take reasonable care to avoid it, Congress intended that its post-occurrence vindication could only take place in a state court, with review in the Supreme Court under 28 U.S.C. Sec. 1257. Thus in reaching the constitutional issue the Baker v. McCollan Court then made a conscious albeit implicit decision that it would not reconsider the Monroe v. Pape interpretation of section 1983.
 
 
 140
 Judge Sloviter states that Justice Rehnquist's distinction between the state of mind required by section 1983 and the state of mind required by the Constitution is "enigmatic." P. 822, n. 3. There is no enigma. Justice Rehnquist was well aware, just as the members of this court are well aware, that some violations of the Constitution plainly do require a state of mind--infliction of punishment in violation of the eighth amendment, for example. Others plainly do not--violations of the establishment clause of the first amendment, for example. Thus the description of Baker v. McCollan as "enigmatic" is no more than an unwarranted effort to disregard the Supreme Court's unadorned refusal in that case to overrule the interpretation of section 1983 which in Monroe v. Pape it had unanimously adopted.
 
 
 141
 Shortly after Baker v. McCollan was decided the Supreme Court in Martinez v. California, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) considered for the first time a provision of the California Tort Claims Act, on which New Jersey's Act is modeled. The section in question, the equivalent of which is N.J.Stat.Ann. Sec. 59:5-2 (West 1982), provided that "[n]either a public entity nor a public employee is liable for: (a) Any injury resulting from determining whether to parole or release a prisoner ...." Cal.Gov't Code Ann. Sec. 845.8(a) (West 1982). Plaintiffs sought recovery in a California state court for the death of a fifteen year old who had been murdered by a sex offender released on parole five months earlier, allegedly as a result of the negligence of the parole officials. The plaintiffs asserted a claim under section 1983, which the California court rejected. On appeal, the Supreme Court affirmed. Justice Stevens wrote:
 
 
 142
 Although the decision to release Thomas from prison was action by the State, the action of Thomas five months later cannot be fairly characterized as state action. Regardless of whether, as a matter of state tort law, the parole board could be said either to have had a "duty" to avoid harm to his victim or to have proximately caused her death, see Grimm v. Arizona Bd. of Pardons and Paroles, 115 Ariz. 260, 564 P.2d 1227 (1977); Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99 (1928), we hold that taking these particular allegations as true, appellees did not "deprive" appellants' decedent of life within the meaning of the Fourteenth Amendment.
 
 
 143
 Her life was taken by the parolee five months after his release. He was in no sense an agent of the parole board. Cf. Scheuer v. Rhodes, 416 U.S. 232 [94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) ]. Further, the parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger. We need not and do not decide that a parole officer could never be deemed to "deprive" someone of life by action taken in connection with the release of a prisoner on parole. But we do hold that at least under the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law. Although a Sec. 1983 claim has been described as "a species of tort liability," Imbler v. Pachtman, 424 U.S. 409, 417 [96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976) ], it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute.
 
 
 144
 444 U.S. at 284-85, 100 S.Ct. at 559 (footnotes omitted).
 
 
 145
 The unanimous decision in Martinez v. California is significant for this case in two respects. First, it confirms that neither California nor New Jersey can confer an immunity which must be recognized in a section 1983 action, even in a state court. The Court recognizes explicitly that because there is concurrent jurisdiction over section 1983 actions, state courts must entertain them.[22] 444 U.S. at 283 n. 7, 100 S.Ct. at 558 n. 7, citing Testa v. Katt, 330 U.S. 386, 391, 67 S.Ct. 810, 813, 91 L.Ed. 967 (1947). Second, the opinion, in determining the liability of the parole officers for their own actions as distinct from the actions of the murderer, makes a conventional tort law proximate cause analysis. There is no suggestion in Martinez v. California that had proximate cause standards been satisfied, the state employees would have been excused from the duty to take reasonable care to prevent foreseeable harm. Indeed the clear implication of Justice Stevens' opinion is that had proximate cause been established between the parole board's negligence and the death of the victim, section 1983 would provide a remedy.
 
 
 146
 The issue of a state of mind requirement in section 1983 was next addressed in Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Unlike the federally protected liberty interest in personal security involved in Baker v. McCollan and in this case, Parratt involved a state law property interest. The plaintiff, an inmate of the Nebraska Penal and Correctional Complex, proceeding pro se convinced the district court that state officers had negligently deprived him of property. The Court of Appeals for the Eighth Circuit affirmed without opinion. 620 F.2d 307 (1980). Nebraska petitioned for certiorari, and the first question presented in its petition is "[w]hether simple negligence, if proven, may form the basis of a judgment under 42 U.S.C. Sec. 1983." Petition for cert. granted, 449 U.S. 917, 101 S.Ct. 315, 66 L.Ed.2d 145, filed May 1, 1980 at 2. Nebraska's brief on the merits identifies the same issue as a question presented: "[w]hether simple negligence, if proven, may form the basis of a judgment under 42 U.S.C. Sec. 1983." Brief for Petitioner at i, Parratt. Point II of Nebraska's brief on the merits is captioned "The Issue of Negligence," id. at 14 and discussion of that issue occupies fifteen pages in a thirty page brief. The American Civil Liberties Union and a variety of amici were permitted to file extensive briefs as amicus curiae on the issue of whether section 1983 requires a particular state of mind. Since Nebraska sought certiorari in a case in which the respondent was a pro se litigant, in which it had to appoint counsel, and in which the Court of Appeals wrote no opinion, it is clear beyond question that the Court deliberately selected Parratt for review in order to consider once again whether section 1983 should for the first time be held to embody a state of mind requirement. Justice Rehnquist confirmed that this was the case, observing that the Court had
 
 
 147
 twice granted certiorari in cases to decide whether mere negligence will support a claim for relief under Sec. 1983, see Procunier v. Navarette, 434 U.S. 555 [98 S.Ct. 855, 55 L.Ed.2d 24] (1978), and Baker v. McCollan, 443 U.S. 137 [99 S.Ct. 2689, 61 L.Ed.2d 433] (1979), [and] in each of those cases found it unnecessary to decide the issue.
 
 
 148
 451 U.S. at 532, 101 S.Ct. at 1911. The quoted statement that in Baker v. McCollan it was not necessary to decide the issue is hardly consistent with Hagans v. Lavine. Be that as it may, in Parratt the Court's holding is explicit. Reviewing the legislative history of section 1983 and its prior interpretation by the Court, Justice Rehnquist wrote:
 
 
 149
 Nothing in the language of Sec. 1983 or its legislative history limits the statute solely to intentional deprivations of constitutional rights. In Baker v. McCollan we suggested that simply because a wrong was negligently as opposed to intentionally committed did not foreclose the possibility that such action could be brought under Sec. 1983 .... Section 1983, unlike its criminal counterpart, 18 U.S.C. Sec. 242, has never been found by this Court to contain a state-of-mind requirement. This Court recognized as much in Monroe v. Pape, 365 U.S. 167 [81 S.Ct. 473, 5 L.Ed.2d 492] (1961) ....
 
 
 150
 451 U.S. at 534, 101 S.Ct. at 1912 (footnote omitted). Justice Rehnquist then approvingly quoted Justice Douglas' statement in Monroe v. Pape that section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Parratt, 451 U.S. at 535, 101 S.Ct. at 1912-1913, quoting 365 U.S. at 187, 81 S.Ct. at 484. He then concluded:
 
 
 151
 Both Baker v. McCollan and Monroe v. Pape suggest that Sec. 1983 affords a "civil remedy" for deprivations of federally protected rights caused by persons acting under color of state law without any express requirement of a particular state of mind. Accordingly, in any Sec. 1983 action the initial inquiry must focus on whether the two essential elements to a Sec. 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.
 
 
 152
 Parratt, 451 U.S. at 535, 101 S.Ct. at 1913.
 
 
 153
 Thus unlike the judges who join in Judge Sloviter's opinion, Justice Rehnquist and the Justices joining in his Parratt v. Taylor opinion found nothing "enigmatic" in his Baker v. McCollan opinion. He read it, as I do, to be consistent with the unanimous interpretation of section 1983 in Monroe v. Pape. Moreover he read Monroe v. Pape in exactly the same way Judge Biggs read it for this court in Basista v. Weir, supra.
 
 
 154
 Only after deciding the issue of statutory interpretation tendered by Nebraska did the Parratt Court turn to the alternative constitutional ground of decision: that for the negligent destruction of personal property a post-event tort remedy satisfies due process. That course was consistent with the Court's settled practice. Had section 1983 been interpreted as requiring a particular state of mind, rather than conduct objectively unreasonable in light of the risk of harm, the Court could, and would, have reversed on statutory rather than constitutional grounds. See, Hagans v. Lavine, supra. Thus the Court's discussion of the statutory issue on which it granted certiorari is unquestionably and unequivocally a holding that a failure to take reasonable care to avoid an invasion of a constitutionally protected interest is actionable under section 1983. The Court continued:
 
 
 155
 Unquestionably, respondent's claim satisfies three prerequisites of a valid due process claim: the petitioners acted under color of state law; the hobby kit falls within the definition of property; and the alleged loss, even though negligently caused, amounted to a deprivation.
 
 
 156
 451 U.S. at 536-37, 101 S.Ct. at 1913 (footnote omitted) (emphasis added). It was not a deprivation without due process of law, however, but only because Nebraska, unlike New Jersey, preserved the historical liabilities of state employees for their failure to take reasonable care of property which because of their positions came into their possession.
 
 
 157
 Before a case presenting a Parratt v. Taylor issue reached this court the Supreme Court in Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) afforded further guidance with respect to the relationship between state positive law and the due process clause of the fourteenth amendment. Logan involved a state-created expectation that physically handicapped persons would not be discriminated against in private employment. In that case state officials in an administrative agency neglected to convene a hearing on the charge of discrimination within the time provided in the antidiscrimination statute, and the Illinois Supreme Court rejected Logan's contention that this neglect violated due process. The Supreme Court, distinguishing Parratt v. Taylor, held that the negligent failure to schedule a hearing deprived Logan of a state-created interest without due process. Justice Blackmun wrote:
 
 
 158
 Despite appellee Zimmerman Brush Company's arguments, the recent decision in Parratt v. Taylor, 451 U.S. 527 [101 S.Ct. 1908, 68 L.Ed.2d 420] (1981) is not to the contrary. There, a state employee negligently lost a prisoner's hobby kit; while the Court concluded that the prisoner had suffered a deprivation of property within the meaning of the Fourteenth Amendment, it held that all the process due was provided by the State's tort claims procedure.
 
 
 159
 455 U.S. at 435, 102 S.Ct. at 1157 (emphasis supplied). Thus the opinion of the Court in Logan confirms what is plain in Parratt: a negligent deprivation of property by a state officer is a deprivation of property within the meaning of the fourteenth amendment.[23] The Logan Court's treatment of Ingraham v. Wright is also significant. Justice Blackmun wrote:
 
 
 160
 In Ingraham v. Wright, 430 U.S. 651 [97 S.Ct. 1401, 51 L.Ed.2d 711] (1977), the Court concluded that state tort remedies provided adequate process for students subjected to corporal punishment in school. In doing so, however, the Court emphasized that the state scheme "preserved what 'has always been the law of the land,' " id., at 679 [97 S.Ct. at 1416], quoting United States v. Barnett, 376 U.S. 681, 692 [84 S.Ct. 984, 990, 12 L.Ed.2d 23] (1964), and that adding additional safeguards would be unduly burdensome. 430 U.S., at 680-682 [97 S.Ct., at 1417-1418]. Here, neither of those rationales is available. Terminating potentially meritorious claims in a random manner is hardly a practice in line with our common-law traditions.
 
 
 161
 455 U.S. at 436 n. 10, 102 S.Ct. at 1158 n. 10 (emphasis supplied).
 
 
 162
 Justice Blackmun's reference to preservation of what has always been the law of the land is significant, because until the New Jersey legislature decreed otherwise, it had always been the law of the land that custodians of incarcerated persons had a duty to take reasonable care to prevent third parties from inflicting harm on their charges. The law of the land in that respect is reflected in the rule announced in Restatement (Second) Torts, Sec. 320 (1965):
 
 
 163
 One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor (a) knows or had reason to know that he has the ability to control the conduct of the third persons, and (b) knows or should know of the necessity and opportunity for exercising such control.
 
 
 164
 Id. Before New Jersey joined California in relieving public employees of their historically recognized duties under the law of the land, the rule announced in Restatement (Second) Torts, Sec. 320 (1965) was the law of that state. Harris v. State, 61 N.J. 585, 297 A.2d 561 (1972).[24] The rule in Logan states plainly that the decision in Ingraham v. Wright would have been otherwise if Florida in that case had attempted to relieve school officials of the duty of care imposed by the common law.
 
 
 165
 After Logan v. Zimmerman Brush Co. was decided a case presenting operative facts similar to those in Parratt v. Taylor was filed in the District of New Jersey. Charles Holman, a prisoner serving a life sentence had attempted to replevy personal property, or to recover its value, in a New Jersey state court.[25] Without considering any section 1983 claim the state court, relying on N.J.Stat.Ann. 59:5-3 (West 1982) dismissed.[26] The prisoner then commenced a section 1983 action in the federal court, and moved for partial summary judgment challenging the constitutionality of section 59:5-3. Judge Debevoise, in a carefully reasoned opinion which relied on Parratt and Logan, granted a partial summary judgment, holding that as applied to Holman, section 59:5-3 was unconstitutional, in that it deprived Holman of important interests in property without due process.
 
 
 166
 The trial court certified the case for interlocutory review pursuant to 28 U.S.C. Sec. 1292(b) (1982), and this court, after careful consideration of essentially the same contentions made by New Jersey in the instant appeal, affirmed. Judge Hunter, who today mysteriously joins in Judge Sloviter's opinion, wrote:
 
 
 167
 Reading Parratt and Logan together, it is plain that while Parratt may relegate a prisoner to his state tort remedies when such remedies are available, Logan provides the framework for analyzing the constitutional adequacy of state procedural limitations on those remedies. Therefore the principles of Logan are applicable in cases where it is claimed that the State refuses to make available to a claimant the established state procedures otherwise available for redress of deprivations of property.
 
 
 168
 Holman v. Hilton, 712 F.2d 854, 858 (3d Cir.1983). Judge Hunter then proceeded to analyze the effect of N.J.Stat.Ann. 59:5-3 on Holman, concluding that while that section of the Tort Claims Act only postponed a lawsuit, tolling the statute of limitations in the meantime, its effect on a prisoner serving a life or long-term sentence was no different, practically, than had the remedy been totally eliminated. 712 F.2d at 859. Since this was so, Holman could bring a section 1983 action for the negligent loss of his property.
 
 
 169
 The opinions in Holman v. Hilton are honest treatments of the Supreme Court case law dealing with the question whether section 1983 includes a state of mind requirement, and they should control the outcome of this case. Judge Sloviter's treatment of the Holman precedent is discussed, infra.
 
 
 170
 After our decision in Holman, and after the decision of the trial court in this case the Supreme Court in Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) confirmed that it meant just what it had said in Parratt v. Taylor and Logan v. Zimmerman Brush Co. In Smith v. Wade, which also involved a section 1983 suit against prison officials for failing to prevent fellow prisoners from harming an inmate, a jury awarded both compensatory and punitive damages. Because the case had been tried as a violation of the eighth amendment, the court's charge to the jury required a finding of gross negligence. On certiorari the defendants conceded liability for compensatory damages, but contended that punitive damages should not have been awarded absent a finding of intentional misconduct. In light of the concession on liability for compensatory damages the Supreme Court had no occasion to consider whether a gross negligence charge was required in every section 1983 action. Reviewing the case law, however, the Court concluded that at common law a finding of "recklessness, serious indifference to or disregard for the rights of others, or even gross negligence" permitted an award of punitive damages. 461 U.S. at 47-48, 103 S.Ct. at 1636. Justice Brennan continued:
 
 
 171
 The remaining question is whether the policies and purposes of Sec. 1983 itself require a departure from the rules of tort common law. As a general matter, we discern no reason why a person whose federally guaranteed rights have been violated should be granted a more restrictive remedy than a person asserting an ordinary tort cause of action.
 
 
 172
 Id. at 49, 103 S.Ct. at 1636. Thus the Court stated unequivocally that section 1983 permitted all the remedies recognized by the common law of torts. One of those remedies is the recovery of damages for the failure of a custodian to take reasonable care to prevent third parties from inflicting harm on those in their custody.[27] In light of Smith v. Wade, an intermediate appellate court is not free to read into section 1983 a higher standard for tort liability than the common law has historically recognized.
 
 
 173
 Even while this appeal was pending the Supreme Court reconfirmed that the key factor in Parratt v. Taylor was the availability of a state common law tort remedy, following a negligent deprivation of property. Hudson v. Palmer, --- U.S. ----, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Indeed Chief Justice Burger stated explicitly that Parratt v. Taylor "held that a negligent deprivation of property by state officials does not violate the Fourteenth Amendment if an adequate postdeprivation state remedy exists." --- U.S. at ----, 104 S.Ct. at 3196. In Hudson the same rule was applied to intentional deprivations occurring in violations of established state procedures. But the case makes clear that both negligent and intentional deprivations are remediable under section 1983 when, as here, the state has eliminated post-deprivation remedies.
 
 
 174
 In view of the unbroken line of authorities from Monroe v. Pape in 1961 through Hudson v. Palmer in 1984 the majority's effort to read into section 1983 a state of mind requirement is utterly untenable.
 
 V.
 
 175
 The Majority's Unprincipled Treatment of Precedent
 
 
 176
 Judge Sloviter's treatment of precedents that should be regarded as controlling is deeply disturbing; the treatment of Holman v. Hilton is particularly so. That decision is mentioned in three contexts.
 
 
 177
 At one point the majority opinion states that section 1983 "plays an effective role ... in providing a federal forum to challenge an established state procedure that infringes upon an individual's liberty or property interests, such as ... the New Jersey statute prohibiting prisoners from bringing tort actions against public entities or employees while confined struck down in Holman v. Hilton, 712 F.2d 854 (3d Cir.1983)." Supra at 829 - 830. Why, one must ask, should section 1983 play a less effective role in providing a forum to challenge the far more drastic prohibitions in N.J.Stat.Ann. Secs. 59:2-4, 59:5-4, 59:6-2, 59:6-7 and 59:5-2(b)(4)? An answer to that obvious question is attempted:
 
 
 178
 In the first place, plaintiff here, unlike the plaintiff in Holman v. Hilton, 712 F.2d 854 (3d Cir.1983), has not challenged the constitutionality of the statute. Plaintiff's claim, instead, is only for money damages from the defendants for the injuries inflicted by the assault.
 
 
 179
 Supra at 831. That dissembling description of Davidson's pro se pleading--a complaint comprised of a printed form furnished by the district court in which Davidson, following instructions, filled in the blanks--is an outrageous violation of the standards announced in Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) for measuring the sufficiency of a pro se litigant's pleading. It disregards, moreover, the concluding prayer in the complaint for "[a]ny other relief equitable and just that the Court deems just and appropriate." App. Da 4. Had counsel been appointed in the district court there might be some justification for distinguishing Holman v. Hilton by insisting that Davidson had failed to plead his legal theories with sufficient specificity. In fact, however, Davidson proceeded pro se throughout the trial, and counsel was appointed for him only in this court. Plainly Judge Brotman who conducted the trial assumed throughout that Davidson was pursuing relief under section 1983 because the Tort Claims Act prohibited him from recovering from Cannon and James under state law. That is the same issue decided in Holman v. Hilton, and discussed by the Supreme Court in Martinez v. California, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980), a case which Judge Brotman cites in his opinion. App. Da 19. The suggestion that the interrelationship between the Tort Claims Act and section 1983 was not presented, and litigated, is an insult to Judge Brotman's considerable intelligence. His own words, quoted in the margin, remove any doubt about the issues which were presented to him, and which he tried.[28]
 
 
 180
 The heart of the majority opinion, however, is its final "distinction" of Holman v. Hilton. Judge Sloviter writes:
 
 
 181
 In the second place, a claim for procedural due process must be predicated on deprivation of a substantive right or interest created by the Constitution, a statute or other entitlement .... Since we have rejected Davidson's claim that his substantive right under the Fourteenth Amendment was deprived by defendants' negligence, and there has been no claim of a statutory or other entitlement, there is nothing to trigger an inquiry into what process is due.
 
 
 182
 Supra at 831. There are two ways in which these obscurant sentences may be read. One possible reading is that Holman v. Hilton survives, with respect to property interests created by state positive law, but does not apply to loss of life or invasion of bodily security. The other is that the failure to take reasonable care to prevent a loss of property does not amount to a deprivation of property.
 
 
 183
 If, as I suspect, the first reading is what is intended, then the majority opinion is an example of perverse obverse Lochnerism. The fundamental error of Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) was the Court's attempt to remove contract, which was always a matter of positive property law, from the reach of law by converting contract into a liberty interest. The object, and temporary result, was to preserve the status quo between employers and employees. What the majority is doing is worse. Rather than elevating property interests to the status of liberty interests, it denegrates the latter by holding that they shall receive less protection than has been afforded the former.
 
 
 184
 If, on the other hand, what is intended is that the negligent destruction of property, absent a state post-destruction remedy, is not a deprivation within the fourteenth amendment, then Holman v. Hilton, announced only 14 months ago, has proved to be "a restricted railroad ticket, good for this day and train only." Smith v. Allwright, 321 U.S. 649, 669, 64 S.Ct. 757, 768, 88 L.Ed. 987 (1944) (Roberts, J., dissenting). Of course the Court in banc is free to play fast and loose with its own precedents, however unwise that course may be.
 
 
 185
 The court in banc is not similarly free, however, to play fast and loose with the Supreme Court's precedents. The cases discussed in Part IV above cannot, consistently with our position as an intermediate court, be given the short shrift treatment reflected in Judge Sloviter's opinion. Moreover cases on which that opinion relies, not discussed in Part IV, do not support the reversal of Davidson's judgment. Several of those cases require special mention.
 
 
 186
 Judge Sloviter quotes Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) in support of the proposition that a state may relieve its agents of the duty to take reasonable care to prevent harm to persons entrusted to their custody. Supra at 824. Like so much else in her opinion the quotation, taken out of context, is used for a misleading purpose. Unlike the states of New Jersey and California, Texas did not relieve its agents rendering medical care to prisoners of the duty of reasonable care. A post-treatment negligence action was available in the Texas courts. 429 U.S. at 107, 97 S.Ct. at 292 (referring to Tex.Civ.Code Ann. art. 6252-19 (Vernon 1970 & Supp.1984)). An examination of the petition for certiorari discloses quite clearly that it did not present any issue relevant to this case. The petitioners construed the pro se complaint as one presenting an eighth amendment claim, and none other. The response to the petition by court appointed counsel and the briefs filed by both sides all proceed on the same assumption. 429 U.S. at 101-02, 97 S.Ct. at 289-90. Nothing was decided in Estelle v. Gamble other than that the eighth amendment required a showing of more than negligence. That case cannot be treated as authority for state power to relieve custodians, or even physicians, of the duty to take reasonable care.
 
 
 187
 Judge Sloviter similarly attempts to wring from Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) support for the proposition that custodians may be relieved of the obligation to take reasonable care to prevent harm. Supra at 824. Once again a quotation, taken out of context, is used for a misleading purpose. Paul v. Davis holds that absent some expectation created by state law there is no substantive interest to be protected by the due process clause. That holding is in my view unfortunate, since it misses the point that human personality has a psychological as well as a physical component, either of which is susceptible to injury. That notwithstanding, the holding has no relevance to this case, for here the injury to Davidson was plainly physical. Moreover this court holds unanimously that entirely aside from state positive law there is a liberty interest in personal security from physical injury. Thus Judge Sloviter's reliance on Paul v. Davis in Part IV of her opinion is inconsistent with the analysis made in Part III, in which the entire court joins.
 
 
 188
 Judge Sloviter also opines that the court's "holding avoids the anomalies that would result ... were a prisoner to be entitled under the Constitution to a higher standard of care than an involuntarily committed mental patient, see Youngberg v. Romeo, 457 U.S. 307 [102 S.Ct. 2452, 73 L.Ed.2d 28] (1982)." Supra at 831 n. 9. Plainly, then, the majority assumes that New Jersey can, as it has done, validly relieve custodians of the mentally ill and the mentally retarded of the duty to take reasonable care to prevent harm from befalling those unfortunates. Youngberg v. Romeo announced no such uncivilized doctrine. As Part III of the majority opinion concedes, Romeo recognizes a liberty interest in freedom from bodily harm. In determining the standard of care appropriate for the protection of that interest, the Supreme Court adopted the standard proposed by Chief Judge Seitz in this court: the exercise of accepted professional judgment. 457 U.S. at 321, 323, 102 S.Ct. at 2461, 2462. That standard is the standard of the common law. Moreover it is precisely the standard from which Cannon and James departed. They failed to discharge their duties as professional custodians of prisoners in accordance with the accepted standards of that calling. The trial court so found, and this court agrees, unanimously, that this finding is not clearly erroneous. Judge Sloviter's treatment of Youngberg v. Romeo is nothing less than a backhanded rejection of the standard of care which it announced. This development bodes ill not only for prisoners but also for the involuntarily committed everywhere in this circuit.
 
 
 189
 Finally, Judge Sloviter's oblique suggestion that the "conduct that shocks the conscience" language in Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) establishes the standard of liability for section 1983 cases, because "[t]he Court did not say whether anything less would suffice,"supra at 830, is irresponsible. That case was a direct criminal appeal involving the issue whether evidence obtained by use of a stomach pump could be admitted in a criminal trial. Justice Frankfurter wrote:
 
 
 190
 The faculties of the Due Process Clause may be indefinite and vague, but the mode of their ascertainment is not self-willed. In each case "due process of law" requires an evaluation based on a disinterested inquiry pursued in the spirit of science, on a balanced order of facts exactly and fairly stated, on the detatched consideration of conflicting claims, ... on a judgment not ad hoc and episodic but duly mindful of reconciling the needs both of continuity and of change in a progressive society.
 
 
 191
 Applying these general considerations to the circumstances of the present case, we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience.
 
 
 192
 Id. (citation omitted). The suggestion that the descriptive phrase in the last quoted sentence defined, for Justice Frankfurter, or any other Justice, the maximum content of the due process clause in a personal liberty context, is simply preposterous. Even if this untenable suggestion were to be adopted as the relevant standard, New Jersey's statutory abrogation of the duty of custodians to take reasonable care to prevent harm from befalling those it has incarcerated may not shock the majority's conscience, but it surely shocks mine.
 
 VI.
 The Absence of Caseload Benefits
 
 193
 Some of those joining in the majority opinion are engaged, one suspects, in a quixotical quest for devices which will make our burgeoning caseload disappear.[29] The gross negligence standard which has been adopted by the majority as the due process minimum will afford no relief in this respect. The pleadings in this case illustrate the problem perfectly. The complaint was made on the district court's printed form, tailored for prisoners' use. In Part IV of the form, captioned "Statement of Claim" the pro se litigant is instructed:
 
 
 194
 State here as briefly as possible the facts of your case. Describe how each defendant is involved. Include also the names of other persons involved, dates and places. Do not give any legal arguments or cite any cases or statutes.
 
 
 195
 App. Da 3 (emphasis in original). The instructions are consistent with the pleading standards announced in Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) and Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Davidson followed them, by simply stating what transpired. He did not mention any standard of care. The court could not on the basis of his statement of claim rule as a matter of law that he would be unable to establish gross negligence. Moreover even if the majority were to impose a requirement that those magic words be included, they would soon appear in every pro se or counseled complaint seeking money damages.
 
 
 196
 Moreover, even at trial the distinction between gross negligence and failure to take reasonable care under the circumstances is not one that is susceptible of application as a matter of law.
 
 
 197
 The prevailing view is that there are no "degrees" of care or negligence, as a matter of law; there are only different amounts of care as a matter of fact; and "gross" negligence is merely the same thing as ordinary negligence, "with the addition," as Baron Rolfe once put it, "of a vituperative epithet."
 
 
 198
 W. Prosser, Handbook of the Law of Torts, 182 (4th ed. 1971) (footnotes omitted). In every case the facts still will have to be developed, and the case will be rare, indeed, when a trial court will discern a line between "gross" and "mere" negligence clear enough to grant a summary judgment or to direct a verdict which would not otherwise have been granted.
 
 VII.
 The Necessity of a Remand
 
 199
 What I have said about the fact-sensitive distinction between the pejorative "gross" negligence and the equally pejorative "mere" negligence suggests that even on the majority's analysis the proper result should be a remand. Obviously Davidson, a pro se litigant, was unaware of the metaphysical distinction which the majority has invented. Moreover Judge Brotman, because he relied on the plain statement in Parratt v. Taylor that negligence sufficed, did not consider whether the conduct of Cannon and James amounted to gross negligence. The case was tried non-jury. The trial court heard the testimony and saw the demeanor of the witnesses. At the very least that court should be afforded an opportunity to reappraise the evidence in light of the new standard which the majority announces.
 
 VIII.
 Conclusion
 
 200
 The holding in this case, that custodians of the involuntarily committed may be relieved of the duty to take reasonable care to prevent harm to persons committed to their charge who are deprived of the ability to resort to self help, is inconsistent with settled Supreme Court case law, inhumane, and indecent. The judgment in Davidson's favor should be affirmed. At the very least the case should be remanded so that the trial court may reconsider the evidence in light of the new standard which the majority announces. I dissent.
 
 
 201
 A. LEON HIGGINBOTHAM, Circuit Judge, dissenting.
 
 
 202
 I dissent for the substantive reasons stated in the opinions of Judges Seitz and Gibbons. I would affirm the judgment of the court below.
 
 
 
 *
 Hon. Clifford Scott Green, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 **
 At the time of the reargument in banc, Judge Seitz was Chief Judge
 
 
 [1]
 This appeal was originally heard by a panel of this court and then reheard by the court in banc pursuant to Chapter IX.A. of the Internal Operating Procedures of this court
 
 
 [2]
 Other courts have treated a prisoner's Sec. 1983 claim against prison officials for failure to protect against unjustified intrusions in personal security as raising an Eighth Amendment claim, see, e.g., Wade v. Haynes, 663 F.2d 778, 781 (8th Cir.1981), aff'd on other grounds sub nom. Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); Withers v. Levine, 615 F.2d 158 (4th Cir.), cert. denied, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980); Clappier v. Flynn, 605 F.2d 519 (10th Cir.1979); Parker v. McKeithen, 488 F.2d 553 (5th Cir.), cert. denied, 419 U.S. 838, 95 S.Ct. 67, 42 L.Ed.2d 65 (1974). Nothing in these opinions, however, signifies rejection of such a claim premised upon the Fourteenth Amendment. In Holmes v. Goldin, 615 F.2d 83 (2d Cir.1980), the court accepted a claim predicated on both bases
 
 
 [3]
 An enigmatic footnote in Baker v. McCollan, 443 U.S. 137, 140 n. 1, 99 S.Ct. 2689, 2692 n. 1, 61 L.Ed.2d 433 (1979), appears to distinguish between the question of defendant's state of mind as bearing on "whether a constitutional violation has occurred in the first place" and "whether Sec. 1983 contains some additional qualification of that nature." Subsequent commentary has drawn a substantive distinction between the two questions. See, e.g., S. Nahmod, Civil Rights & Civil Liberties Litigation Sec. 3.02 (Supp.1983). However, in earlier cases, the Court treated the scope of Sec. 1983 and the Fourteenth Amendment correlatively. See, e.g., Paul v. Davis, 424 U.S. 693, 699, 96 S.Ct. 1155, 1159, 47 L.Ed.2d 405 (1976). For purposes of this case, the questions whether negligent conduct by state officials is a deprivation of Fourteenth Amendment rights and whether it can be redressed by suit under Sec. 1983 appear to be mirror images of each other
 
 
 [4]
 The academic commentary has also been distinguished by its diversity of opinion. See, e.g., Kirkpatrick, Defining a Constitutional Tort Under Section 1983: The State-Of-Mind Requirement, 46 U.Cin.L.Rev. 45 (1977); McClellan & Northcross, Remedies and Damages for Violation of Constitutional Rights, 18 Duq.L.Rev. 409 (1980); Whitman, Constitutional Torts, 79 Mich.L.Rev. 5 (1980); Note, Basis of Liability in a Section 1983 Suit: When is the State-Of-Mind Analysis Relevant?, 57 Ind.L.J. 459 (1982); Note, Section 1983 Liability for Negligence, 58 Neb.L.Rev. 271 (1978); Note, A Theory of Negligence for Constitutional Torts, 92 Yale L.J. 683 (1983)
 
 
 [5]
 The Civil Rights Acts of 1870 and 1871, codified today as 42 U.S.C. Secs. 1981, 1982, 1983, 1985, and 1986 were enacted to enforce the newly ratified Civil War Amendments in the hostile southern states. As Justice Harlan said in his dissent in the Civil Rights Cases, 109 U.S. 3, 44, 3 S.Ct. 18, 45, 27 L.Ed. 835 (1883), the pervading purpose of those amendments was to secure "the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppression of those who had formerly exercised unlimited dominion over him" (quoting The Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1872)). Section 1983 originated as Sec. 1 of the Act of April 20, 1871, 17 Stat. 13, and "was passed by a Congress that had the Klan 'particularly in mind.' " Monroe v. Pape, 365 U.S. at 174, 81 S.Ct. at 477 (quoting Randall, The Civil War and Reconstruction, 857 (1937)). Referring frequently to a 600-page report documenting outrages against blacks that had gone unpunished, the 42d Congress sought a remedy "against those who representing a State in some capacity were unable or unwilling to enforce a state law." Id. at 176, 81 S.Ct. at 478 (Court's emphasis)
 
 
 [6]
 As our analysis of Parratt shows, the statement in Holman v. Hilton, 712 F.2d 854 (3d Cir.1983), reading Parratt as holding "as a general matter, that Sec. 1983 affords a remedy for negligent deprivation of federally protected rights by persons acting under the color of state law," id. at 856, is too broad. It was, in any event, unnecessary to the holding of the case that the established state procedure at issue violated due process
 
 
 [7]
 Although in this case we deal with due process violations under the Fourteenth Amendment, the constitutional deprivation supporting Sec. 1983 recoveries is not limited to that provision. See, e.g., Brule v. Southworth, 611 F.2d 406 (1st Cir.1979) (discharge for exercise of First Amendment rights); Tinetti v. Wittke, 620 F.2d 160 (7th Cir.1980) (strip search for traffic violation infringed Fourth Amendment)
 
 
 [8]
 Judges Weis and Garth do not believe that this case presents the issue of gross negligence and do not join in the reference to it
 
 
 [9]
 Our holding avoids the anomalies that would result were a prisoner's Sec. 1983 suit such as this under the Fourteenth Amendment to be judged under a lesser standard of care than the deliberate indifference standard applicable to a prisoner's Eighth Amendment claim, see Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), or were a prisoner to be entitled under the Constitution to a higher standard of care than an involuntarily committed mental patient, see Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)
 Some members of this court believe that in circumstances such as those presented here, the Eighth Amendment standard is the same as that of the substantive due process clause of the Fourteenth Amendment, and that consistency demands that the Fourteenth Amendment not proscribe conduct the Eighth Amendment permits. See Williams v. Mussomelli, 722 F.2d 1130, 1132-34 (3d Cir.1983). See also Rhodes v. Robinson, 612 F.2d 766 (3d Cir.1979) (discussion of opinions applying similar standards in cases arising under the two amendments).
 However, other members of the court believe the standard for liability under Sec. 1983 "may well not be susceptible of a uniform answer across the entire spectrum of conceivable constitutional violations which might be the subject of a Sec. 1983 action." See Baker v. McCollan, 443 U.S. at 139-40, 99 S.Ct. at 2692. Because the district court in this case found that there was no Eighth Amendment violation, and no cross-appeal has been filed, the Eighth Amendment issue is not before us.
 
 
 [10]
 The New Jersey provision struck down in Holman v. Hilton, 712 F.2d 854 (3d Cir.1983), did not create a substantive defense but instead precluded a prisoner from asserting the cause of action to which s/he was entitled until the prisoner was released from prison. Id. at 857-58. That holding is not jeopardized by this opinion
 
 
 [1]
 Both Judge Weis and Judge Garth join the majority opinion
 
 
 [2]
 As the majority opinion correctly states (Maj. Op. at page 830) a claim for procedural due process arises only after a deprivation of some substantive right or interest created by the Constitution, by statutes, or by other entitlement. Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Because the majority of this court has rejected Davidson's claim that his substantive right under the Fourteenth Amendment was deprived by the defendants' negligence, the majority opinion had no occasion to consider a procedural due process analysis. I would not do so either were it not for the position taken by our colleagues, who are not in the majority that a procedural due process analysis would provide Davidson with a 1983 action in federal court and would thus lead to a result contrary to the result reached by the majority
 For purposes of this discussion, therefore, I will assume that mere negligence by state officials could constitute a deprivation of Davidson's liberty interest. However, it does not follow from that assumption that the remedy must be provided in federal court pursuant to section 1983. To hold that negligent conduct by a state official serves to convert duties imposed by state tort law into substantive constitutional violations which lay the necessary predicate for a procedural due process inquiry is not a result compelled by Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).
 
 
 [3]
 There is analogous precedent for this type of balancing of interests where immunity has been upheld in a variety of circumstances. See Nixon v. Fitzgerald, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (President is absolutely immune from suit); Butz v. Economou, 438 U.S. 478, 513-14, 98 S.Ct. 2894, 2914-15, 57 L.Ed.2d 895 (1978) (Administrative Law Judge employed by Executive Branch absolutely immune from prosecution); Imbler v. Pachtman, 424 U.S. 409, 420-28, 96 S.Ct. 984, 990-94, 47 L.Ed.2d 128 (1976) (prosecutor absolutely immune from liability for decision to initiate prosecution); Pierson v. Ray, 386 U.S. 547, 553-55, 87 S.Ct. 1213, 1217-18, 18 L.Ed.2d 288 (1967) (state municipal judge absolutely immune from prosecution under section 1981)
 
 
 [4]
 Were an absolute grant of immunity, precluding state tort suits, sufficient to establish a right to a federal remedy, a pedestrian negligently struck by a police car racing to apprehend a criminal, would be entitled to maintain a 1983 action in federal court if a state immunity statute shielded police from liability for negligent acts occurring in the course of duty. Yet, if the enactment of an immunity statute by a state is deemed to result in a federal remedy by default, not only would the state's legitimate interest in fashioning rules of tort law be curtailed, but also state law would then determine the content of 1983 actions in federal court. This reasoning "would make the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States." Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). I suggest that to allow a federal constitutional remedy in the circumstances presented here is not only contrary to the purposes of section 1983 but necessarily trivializes 1983 actions
 
 
 [5]
 Thibodeaux v. Bordelon, 740 F.2d 329 (5th Cir.1984) is not to the contrary. Admittedly, Thibodeaux does not adopt the majority's distinction between "liberty interests" and "property interests." However, in its procedural due process analysis, Thibodeaux affirmed the dismissal of the plaintiff's negligence action remitting him to his state law remedies. Thibodeaux does not address or discuss what result would obtain if no remedy were available in the Louisiana state courts. Nothing in Thibodeaux indicates that in such a situation the Fifth Circuit would then hold that the plaintiff had stated a federal cause of action under 1983. To the contrary, throughout its opinion, Thibodeaux cites the Fourth Circuit case of Daniels v. Williams, 720 F.2d 792 (4th Cir.1983) with approval. It should be remembered that Daniels did not remit the plaintiff to a federal cause of action when his state claim was barred by the doctrine of sovereign immunity
 
 
 [1]
 This case does not call upon us to consider Sec. 1983 claims founded on alleged violations of constitutional provisions other than the Due Process Clause
 
 
 [2]
 In this case, the mere right to file an action is tantamount to no process at all since, under New Jersey's immunity statute, the action must be terminated prior to any proceedings on the merits. It is true that due process does not always require proceedings on the merits. For instance, "the state certainly accords due process when it terminates a claim for failure to comply with a reasonable procedural or evidentiary rule." Logan v. Zimmerman Brush Co., 455 U.S. 422, 437, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982). But this state immunity statute denies any "opportunity for [a] hearing appropriate to the nature of the case." Id. at 428, 102 S.Ct. at 1153 (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)). Only a federally-recognized immunity justifies this result, otherwise "a state immunity defense ... would transmute a basic guarantee into an illusory promise ...." Martinez v. California, 444 U.S. 277, 284 n. 8, 100 S.Ct. 553, 558 n. 8, 62 L.Ed.2d 481 (1980) (quoting Hampton v. Chicago, 484 F.2d 602, 607 (7th Cir.1973), cert. denied 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974))
 
 
 [1]
 United States v. Harris, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1882) (Federal antilynching law unconstitutional); J. Chadbourn, Lynching and the Law (1933); W. White, Rope & Faggot (1929); National Association for the Advancement of Colored People, Thirty Years of Lynching in the United States 1889-1918 (1919); J. Cutler, Lynch-Law; An Investigation of the History of Lynching in the United States (1969)
 
 
 [2]
 But see Union County Jail Inmates v. DiBuono, 713 F.2d 984, 718 F.2d 1247 (3d Cir.1983) (pretrial detainees and sentenced inmates may be confined in conditions comparing unfavorably with those permitted by federal laws regulating the confinement of animals)
 
 
 [3]
 1961 Cal.Stat., c. 1404, p. 3209, codified at Cal.Civ.Code Sec. 22.3, Cal.Gov't Code Sec. 9611 (West 1982) (repealed 1979)
 
 
 [4]
 Cf. Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (Government entity does not enjoy immunities of its agents)
 
 
 [5]
 Cal.Gov't Code Sec. 810 et seq. (West 1982 & Supp.1984)
 
 
 [6]
 The New Jersey courts have repeatedly acknowledged the California provenience of the New Jersey Tort Claims Act. See, e.g., Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes, 90 N.J. 582, 449 A.2d 472 (1982); Rivera v. Gerner, 89 N.J. 526, 446 A.2d 508 (1982); Brown v. Brown, 86 N.J. 565, 432 A.2d 493 (1981); Costa v. Josey, 83 N.J. 49, 415 A.2d 337 (1980); Kolitch v. Lindedahl, 193 N.J.Super. 540, 475 A.2d 86 (App.Div.1984); Speziale v. Newark Housing Authority, 193 N.J.Super. 413, 474 A.2d 1085 (App.Div.1984)
 
 
 [7]
 The Act makes a distinction between retrospective remedies at law and prospective remedies in equity. N.J.Stat.Ann. Sec. 59:1-4 (West 1982). Obviously a prospective remedy would be of no use to Davidson. See Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)
 
 
 [8]
 Cf. Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); Rennie v. Klein, 720 F.2d 266 (3d Cir.1983)
 
 
 [9]
 Other immunity provisions in the Tort Claims Act, not significant for the duty of care owed to persons involuntarily confined, relate to 42 U.S.C. Sec. 1983 in other respects. These include N.J.Stat.Ann. Secs. 59:2-5 and 59:3-6 (West 1982) (no liability for an injury caused by issuance, denial, suspension or revocation of, or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similar authorization); id. Secs. 59:2-8 and 59:3-13 (no liability for injuries caused by the termination or reduction of benefits under a public assistance program); id. Sec. 59:3-2 (no liability for an injury resulting from exercise of judgment or discretion); id. Sec. 59:3-3 (no liability for good faith action in execution or enforcement of any law); id. Sec. 59:3-4 (no liability for injury caused by action under apparent authority of a law that is unconstitutional, invalid or inapplicable); id. Sec. 59:3-5 (no liability for any injury caused by failure to enforce any law); id. Sec. 59:3-8 (no liability for injury caused by initiation or prosecution of any judicial or administrative proceeding); id. Sec. 59:3-9 (no liability for entry upon any property); id. Sec. 59:3-10 (no liability for misrepresentation made in scope of employment); id. Sec. 59:5-1 (no liability for failure to provide facilities in a prison or other correction facility); id. Sec. 59:5-4 (no liability for failure to provide police protection)
 
 
 [10]
 Addington v. Texas reconfirmed the authority of O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); and Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967)
 
 
 [11]
 Judge Garth's separate opinion is too sophisticated for my comprehension, but since he joins in Judge Sloviter's opinion, I assume that he approves the holding in Part III thereof that Davidson has a constitutionally protected right to personal safety while confined
 
 
 [12]
 In this respect New Jersey is consistent. It denies any duty to protect the safety of any of them
 
 
 [13]
 Act of April 9, 1866, ch. 31, Sec. 3, 14 Stat. 27
 
 
 [14]
 Act of April 20, 1871, ch. 22, Sec. 1, 17 Stat. 13
 
 
 [15]
 Act of May 8, 1792, ch. 36, Sec. 2, 7 Stat. 275, 276. See, Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 6 L.Ed. 253 (1825) (changes in state procedural law inapplicable in actions at law in a federal court). Cf. Act of June 1, 1872, ch. 255, 17 Stat. 196
 
 
 [16]
 The anesthesia was administered principally in Carter v. Greenhow, 114 U.S. 317, 5 S.Ct. 928, 29 L.Ed. 202 (1884), Holt v. Indiana Manufacturing Co., 176 U.S. 68, 20 S.Ct. 272, 44 L.Ed. 374 (1900) and Barney v. City of New York, 193 U.S. 430, 24 S.Ct. 502, 48 L.Ed. 737 (1904)
 
 
 [17]
 Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) is the leading example
 
 
 [18]
 The examination was less thorough then it should have been. Compare, Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) with Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)
 
 
 [19]
 There are striking similarities between Judge Sloviter's opinion and Justice Frankfurter's Monroe v. Pape dissent. Judge Sloviter does not go so far, however, as to suggest as Justice Frankfurter urged that Barney v. City of New York, 193 U.S. 430, 24 S.Ct. 502, 48 L.Ed. 737 (1904) which had been cast in doubt by Home Tel. & Tel. Co. v. Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510 (1913), and overruled in United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960), should be reestablished. This Court is still unanimously of the view that the legality or illegality of a defendant's action under state law is not determinative for purposes of section 1983 or the fourteenth amendment
 
 
 [20]
 See, e.g., Aldisert, Judicial Expansion of Federal Jurisdiction: A Federal Judge's Thoughts on Section 1983, Comity and the Federal Caseload, 1973 Law and Social Order 557 (1973)
 
 
 [21]
 See, e.g., Picking v. Pennsylvania R. Co., 151 F.2d 240 (3d Cir.1945); Hague v. C.I.O., 101 F.2d 774 (3d Cir.), aff'd in part and modified in part, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)
 
 
 [22]
 Thus despite any possible implication to the contrary in Judge Garth's opinion, the outcome of this case must be the same whether Davidson proceeded in a federal or a state forum. The state could eliminate causes of action based on state law, but must entertain section 1983 causes of action
 
 
 [23]
 Judge Sloviter mentions Logan v. Zimmerman Brush Co., p. 830, but her selective quotation unfairly ignores those parts of Justice Blackmun's opinion in which he discusses issues relevant to this case
 
 
 [24]
 The rule is not a recent innovation. Both the black-letter and Comments in Restatement (Second) Torts Sec. 320 (1965) are taken verbatim from Restatement (First) Torts Sec. 320 (1934). Comment (a) provides that "[t]he rule stated in this Section is applicable to a sheriff or peace officer, a jailer or warden of a penal institution, officials in charge of a state asylum or hospital for the criminally insane, or to teachers or other persons in charge of a public school. It is also applicable to persons conducting a private hospital or asylum, a private school, and to lessees of convict labor." See, e.g., Necolayff v. Genesee Hospital, 270 A.D. 648 (N.Y.App.Div.), 61 N.Y.S.2d 832, 836 (1946), affirmed, 296 N.Y. 936, 73 N.E.2d 117 (1947) (Section 320 duty of care applies to hospital patients); Daniels v. Andersen, 195 Neb. 95, 237 N.W.2d 397, 400 (1975) (Section 320 duty of care obliges jailer to take reasonable care to prevent beating by a fellow inmate)
 
 
 [25]
 Holman v. Hilton, 542 F.Supp. 913 (D.C.N.J.1982)
 
 
 [26]
 That section of the Tort Claims Act prohibits suits by prisoners against any public entity or public employee while the prisoner is confined. That provision is applicable to Davidson, but the provisions referred to in the text would prohibit a suit for the injuries he suffered in this case even after his release
 
 
 [27]
 Even the dissenters in Smith v. Wade did not urge that for compensatory damages a different state of mind than failure to take reasonable care was required. They only urged that more than gross negligence or reckless disregard should be required for the award of punitive damages. Id. 461 U.S. at 56, 103 S.Ct. at 1640 (Rehnquist, J., dissenting); id. at 94, 103 S.Ct. at 1658 (O'Connor, J., dissenting)
 
 
 [28]
 Judge Brotman wrote:
 The first step is to inquire whether the assault here implicates a "liberty interest" protected by the due process clause. Freedom from physical attack and injury undeniably falls within the compass of constitutionally protected liberty. To be free of personal violence is the basic core of liberty. "To be free from, and to obtain judicial relief for, unjustified intrusions on personal security ... [is one of] the historic liberties" protected at common law and by the due process clause. Ingraham v. Wright, 430 U.S. 651, 672-73 [97 S.Ct. 1401, 1413, 51 L.Ed.2d 711] (1977). See Youngberg v. Romeo, [457 U.S. 307], 102 S.Ct. 2452 [73 L.Ed.2d 28] (1982). Even while incarcerated, plaintiff enjoys a constitutionally protected interest in conditions of reasonable care and safety.
 Defendants emphasize that plaintiff seeks to recover damages for a single attack. They refer to recent statements by the court of appeals that "[t]he right to protection is not actuated by an isolated mishap, or called into question by each bruise that a patient [here, prisoner] may suffer," and that "no one is guaranteed an injury-proof life." Romeo v. Youngberg, 644 F.2d 147, 162 (3d Cir.1980), vacated and remanded, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). But as defendants have also pointed out, the critical aspect is not the weight of the interest, but its nature. Board of Regents v. Roth, 408 U.S. 564, 570-71 [92 S.Ct. 2701, 2705-06, 33 L.Ed.2d 548] (1972). Thus the first analytical step is whether security from assault is within the ambit of "liberty." Whether the assault is aggravated or repeated does not alter its nature, but simply its weight.
 Furthermore, the instant case is not about a "bruise" or an inadvertent accident. It does not involve some "de minimis" personal injury, but a vicious and traumatic attack inflicting severe wounds. The defendants were personally apprised of the anticipated assault, and knowing of McMillian's violent character, did nothing to prevent its occurrence. Had reasonable precautions been taken, even as simple as issuing a warning to McMillian, the evidence suggests that plaintiff would not have been injured. Defendants knew that McMillian represented a "special danger" to plaintiff. Cf. Martinez v. California, 444 U.S. 277, 285 [100 S.Ct. 553, 559, 62 L.Ed.2d 481] (1980).
 * * *
 Defendants argue that plaintiff did not enjoy a "liberty interest" in his personal security because defendants did not intentionally permit the assault, but were merely negligent about his safety. This argument confuses the notion of liberty interest with the notion of deprivation. State of mind has no relevance for purposes of identifying what is a liberty interest and what is not.
 Rather, we believe defendants' argument is that state of mind is significant for purposes of determining whether the defendant deprived plaintiff of his liberty. Defendants suggest that unless the actions of the state officials were intentional, reckless, or malicious, there has been no "deprivation" of rights. But as we have discussed in our prior opinion, the Supreme Court has held that a state official's negligence is sufficient to constitute a "deprivation" for due process purposes. Parratt v. Taylor, 451 U.S. 527 [101 S.Ct. 1908, 68 L.Ed.2d 420] (1981). We do not agree with defendants that Parratt's holding regarding negligent deprivation is irrelevant to the instant case on the ground that Parratt involved a property rather than a liberty interest. We do not believe these categories are so rigid. The distinction between property and liberty interests does not alter the relevant reasoning, which is that Sec. 1983 does not include a requirement that the official's act be intentional. Defendants assert that we should impose a "deliberate indifference" standard, borrowed from the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97 [97 S.Ct. 285, 50 L.Ed.2d 251] (1976). This standard was rejected as inappropriate under due process analysis in Youngberg v. Romeo, [457 U.S. 307], 102 S.Ct. at 2456 n. 11.
 Defendants Cannon and James, acting under authority of state law, negligently deprived plaintiff of his liberty interest in remaining free from physical assault. This brings us to the second step of due process analysis, to inquire whether the state has provided the "process" which is due under the circumstances. As we discussed in our prior opinion, New Jersey provides plaintiff no process whatsoever by which to pursue a remedy against the state or state officials for injuries inflicted by another prisoner. N.J.Stat.Ann. 59:5-2 (West 1982).
 App. Da 18-Da 20 (footnote omitted).
 
 
 [29]
 See note 20 supra